**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CHAMPION INTERNATIONAL
CORPORATION,
Plaintiff-Appellant,

v.

No. 98-1148

UNITED PAPERWORKERS
INTERNATIONAL UNION, AFL-CIO;
UNITED PAPERWORKERS
INTERNATIONAL UNION, LOCAL 507,
Defendants-Appellees.

Appeal from the United States District Court
for the Western District of North Carolina, at Asheville.
Max O. Cogburn, Magistrate Judge.
(CA-96-280-1-C)

Argued: October 28, 1998

Decided: February 23, 1999

Before NIEMEYER and MICHAEL, Circuit Judges, and
BOYLE, Chief United States District Judge for the
Eastern District of North Carolina, sitting by designation.

_____

Vacated and remanded by published opinion. Judge Niemeyer wrote
the opinion, in which Judge Michael and Chief Judge Boyle joined.

_____

**COUNSEL**

**ARGUED:** Gregory Phillip McGuire, HAYNSWORTH, BALDWIN,
JOHNSON & GREAVES, Greensboro, North Carolina, for Appel-
lant. Joyce Murphy Brooks, Charlotte, North Carolina, for Appellees.

**OPINION**

NIEMEYER, Circuit Judge:

As a result of a general reduction in force implemented by Champion International Corporation at its Canton Mill facility in Canton, North Carolina, 17 employees, whose "general utility" crew positions had been eliminated, filed a grievance alleging the impairment or abrogation of job bidding rights given them under their collective bargaining agreement. The arbitrator misinterpreted the grievance and issued an award under a separate and special plant-modernization agreement negotiated by Champion and the Union to compensate only those employees whose positions were eliminated by the earlier shutdown of a specific paper-making machine at the plant.

On appeal from the district court's affirmance of the award, we conclude that although the grievants' claim remains arbitrable, any remedy must derive from the collective bargaining agreement and not from the special plant-modernization agreement. Accordingly, we vacate the award and remand to enable the grievants to commence a new arbitration of their grievance if they so choose.

I

In 1991, Champion International Corporation, a paper manufacturer, undertook to modernize its Canton Mill facility. The modernization project involved permanently shutting down "No. 14 Machine" and opening up a new, smaller pulp mill. At the time of its decision, Champion was party to a collective bargaining agreement with the United Paperworkers International Union, AFL-CIO, and its affiliated Local 507 (hereafter collectively, the "Union"). Accordingly, Champion negotiated with the Union a specific agreement to address the procedures for compensating those hourly employees at the Canton Mill whose positions would be eliminated as a direct result of the modernization project. This agreement, executed on September 19, 1991, was known as "Policy 683."

Policy 683, which was to be in effect only until December 31, 1993, authorized either severance pay or stabilization bonuses to

2

workers whose jobs were directly affected by the modernization project. The severance pay provisions entitled employees to receive a lump sum severance payment equal to three weeks' pay plus one week's pay for each year of service and one additional week's pay for each year of service over 15 years. By receiving a severance payment, the employee agreed to waive all "recall and/or bumping rights" under the collective bargaining agreement. Policy 683 also provided for stabilization bonuses as an "incentive to keep people in the old manufacturing facility" -- a way to maintain the productivity of the soon-to-be retired No. 14 Machine by retaining the employees who operated it until the new mill was ready. Without the monetary inducement of the stabilization bonus, employees would likely bid out for other jobs within the mill. In effect, the bonus compensated employees for delaying exercise of their job bidding rights under the collective bargaining agreement. The stabilization bonuses ranged from $1,000 to $10,000, depending on how long the employee remained at work on No. 14 Machine.

Specific procedures for making claims for payment under Policy 683 and for reviewing denials of claims were set out in the Policy. Policy 683 provided that all claims were to be made to an administrator and that appeals from denials of claims could be taken internally. It also provided that if an employee were denied a claim "in whole or in part," the employee could "seek assistance from the United States Department of Labor, or such employee [could] file suit in state or federal court." Policy 683 did not mention arbitration.

A year after Policy 683 was executed, Champion undertook an independent, across-the-board reduction in workforce in response to the deteriorating overall financial condition of the Canton Mill facility. Again, Champion negotiated an agreement with the Union to implement the reduction in force. This agreement provided for severance payments to employees who elected to be severed and a procedure for filling the vacancies created by those elections through the "normal posting and [job] bidding process." The agreement did not, however, provide for any kind of stabilization bonus comparable to those provided for in Policy 683.

As a result of the general reduction in force, the entire "general utility" workgroup was notified in February 1994 that their positions

3

were to be eliminated in June 1994. The 17 employees in that group then filed a grievance against Champion under the collective bargaining agreement, claiming that because they did not learn soon enough of the elimination of their workgroup, they lost job bidding rights. In their grievance, they stated:

> Company representatives admittedly knew that the Gen. Util. crew would be eliminated in June '94. By not sharing this info., and deliberately covering up the matter, crew employees were not given the right to explore alternative avenues of employment within the mill. (Job bidding). Request displacement compensation equal to #14 for each crew member $7,000. We request total of $119,000.00.

Although these 17 employees alluded in their grievance to compensation "equal to #14 for each crew member $7,000" (emphasis added), it is undisputed that these 17 employees were not terminated by the shutdown of Machine No. 14 and therefore were not identified in Policy 683 as those who were entitled to compensation as a direct result of modernization.

These employees' grievance was denied at each step of Champion's internal grievance procedure provided by the collective bargaining agreement and then was submitted to final, binding arbitration in May 1996. The arbitrator to whom the matter was assigned undertook to decide the following two issues:

> [Is] the Grievants' claim for Stabilization Bonus payments under Severance Plan No. 683 substantively arbitrable?

> Whether the Company violated the Collective Bargaining Agreement by withholding the Stabilization Bonus payments provided in Severance Plan No. 683 to the utility crew employees in the Paper and Board department?

In rendering an award for the 17 employees, the arbitrator concluded that "the Grievants' claim for stabilization bonus payment is arbitrable" and that Champion "violated the Agreement by withholding the Stabilization Bonus payments provided in Severance Plan No. 683 to the utility crew employees in the Paper and Board department."

4

Seeking review of the award in the courts, Champion filed this action under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a), to bar enforcement of the award, and the Union filed a cross-claim for enforcement. On cross motions for summary judgment, the district court entered judgment in favor of the Union, enforcing the award of stabilization bonuses to the 17 employees.

On this appeal, Champion contends (1) that because there was no evidence of economic loss by the grievants, the $119,000 award was punitive, and punitive damages were not authorized by either the collective bargaining agreement or Policy 683; (2) that the 17 grievants were not covered by Policy 683 and therefore not entitled to the stabilization bonuses provided for in the Policy; and (3) that disputes arising under Policy 683 are not arbitrable.

II

The logical order for review of the district court's judgment affirming the arbitration award in this case suggests that we determine first, whether the grievance filed by the 17 employees is a matter for arbitration, and second, whether the arbitration award itself draws its essence from the agreement providing for the arbitration. The controlling principles for addressing these questions are well established.

Because the requirement to submit to arbitration is solely a matter of contract, arbitrability is a matter of contract interpretation which is "undeniably an issue for judicial determination." AT&T Technologies, Inc. v. Communications Workers, 475 U.S. 643, 648-49 (1986). Therefore, "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." Id. at 649; see also Brown v. Trans World Airlines, 127 F.3d 337, 340 (4th Cir. 1997) ("The determination of the arbitration provision's scope and meaning is for the court to resolve"); Local 637, Int'l Bhd. of Elec. Workers v. Davis H. Elliot Co., 13 F.3d 129, 132 (4th Cir. 1993) ("Were arbitrators given the authority to decide their own jurisdiction, arbitration clauses would be far less popular").

But for matters within the scope of an arbitration clause, the arbitrator's award is final and binding. A court does not "sit to hear

5

claims of factual or legal error by an arbitrator," and must defer to the arbitrator "as long as the arbitrator is even arguably construing or applying the contract." United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987); see also Mountaineer Gas Co. v. Oil, Chemical & Atomic Workers Int'l Union, 76 F.3d 606, 608 (4th Cir. 1996) (describing the court's role as determining "only whether the arbitrator did his job -- not whether he did it well, correctly, or reasonably, but simply whether he did it" (citing Remmey v. PaineWebber, Inc., 32 F.3d 143, 146 (4th Cir. 1994))).

The court nevertheless retains the obligation to insure that the arbitrator has acted within the contractually-drawn boundaries of his authority. This is important because

> an arbitrator . . . does not sit to dispense his own brand of industrial justice. . . . [H]is award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597 (1960). Thus, a court must vacate an arbitrator's award if it violates clearly established public policy, fails to draw its essence from the collective bargaining agreement, or reflects merely the arbitrator's personal notions of right and wrong. See Mountaineer Gas, 76 F.3d at 608.

While an arbitrator is generally under no obligation to provide reasons for his decision, Enterprise Wheel, 363 U.S. at 598, a court reviewing an arbitration award must satisfy itself that the award is grounded in the collective bargaining agreement rather than in the arbitrator's "own brand of industrial justice," id. at 597. One way to test the validity of an arbitration award on this basis is to ask "whether the award ignored the plain language of the [collective bargaining agreement]." Mountaineer Gas, 76 F.3d at 608.

III

Turning now to the case before us, the 17 grievants complained that Champion's delay in informing them that the "general utility"

6

crew jobs would be eliminated by the across-the-board reduction in force interfered with their ability to bid for other jobs. They requested compensation for this alleged abridgement of rights guaranteed by the collective bargaining agreement in an amount equal to the stabilization bonuses provided for under Policy 683, but they did not request the actual bonuses. The arbitrator first misinterpreted this grievance to present the question of whether the grievants' claims for "Stabilization Bonus payments under Severance Plan No. 683 [were] substantively arbitrable." (Emphasis added). The arbitrator concluded that Policy 683 was a continuing negotiation with respect to the underlying collective bargaining agreement and that upon its execution, Policy 683 became a part of the collective bargaining agreement. In addition to concluding that Policy 683 was not an independent agreement, the arbitrator also concluded that Policy 683 did not modify the collective bargaining agreement's arbitration clause. Accordingly, the arbitrator relied on the arbitration clause of the underlying collective bargaining agreement for jurisdiction to enter his award of stabilization bonuses under Policy 683.

While it is true that the collective bargaining agreement provided the arbitrator with jurisdiction to "interpret, apply, or determine compliance with the provisions of this [collective bargaining] Agreement," it does not follow that disputes under Policy 683 must therefore be resolved through arbitration. On the contrary, Policy 683 provided that initial claims for stabilization bonuses were to be made to Champion's plan administrator who was given, under Policy 683, "the power and authority in its sole, absolute and uncontrolled discretion to control and manage the operation and administration of the Policy." Any disagreement with the decision of the administrator would have to be resolved by appeals, first to the vice president of "Benefits" and then to the vice president of "Employee Staffing and Development." Policy 683 then provided that a claimant could seek further relief from the Department of Labor or from state or federal courts.

The confusion surrounding the arbitrability of this dispute stems from the arbitrator's misinterpretation of the grievance as arising under Policy 683 rather than under the job bidding procedures of the collective bargaining agreement and then his further misinterpretation that disputes over Policy 683 benefits are arbitrable under the collec-

7

tive bargaining agreement without regard for the dispute resolution mechanisms provided by Policy 683. If he had correctly read the grievants' claim as arising under the job-bidding provisions of the collective bargaining agreement, the nature of Policy 683's benefits and their arbitrability would never have come under consideration. Although it is true that the grievants did request damages in an amount "equal to" the stabilization bonuses awarded to employees whose employment was terminated by the close of No. 14 Machine, it is also clear that they neither claimed those specific benefits nor explicitly mentioned Policy 683. Their reference to "#14" was merely an attempt at valuing compensation for a waiver of job bidding rights by alluding to a measure agreed upon in another, nonapplicable agreement.

On its face, the grievance rested on the collective bargaining agreement without regard to Policy 683. A grievance claiming lost or compromised job bidding rights could only be made under Article VIII(F) of the collective bargaining agreement and under Article XXX(B) which requires notice of "change [in] methods of operation . . . which may result in elimination of jobs." Although the grievants -- who completed the grievance form without the assistance of counsel -- did not invoke these specific articles of the collective bargaining agreement, they did use the term "Job Bidding" to specify the contractual rights they claim were abridged by Champion. In their own words, the employees identified their claimed harm as a loss of the "right to explore alternative avenues of employment within the mill." In essence, the grievants claimed that in reliance on Champion's statements that their jobs were not in jeopardy in the across-the-board workforce reduction, "general utility" crew members refrained from using their often considerable seniority to bid out to other jobs at the Canton Mill. Had they been advised otherwise, the grievants alleged, they would have exercised their bidding rights under the collective bargaining agreement and would consequently have enjoyed greater seniority, wages, or promotion potential. They allege that by failing to disclose timely the necessity of eliminating the "general utility" classification, Champion caused the grievants involuntarily to waive their job bidding rights.

This claim, whether meritorious or not, clearly arises under collective bargaining agreement provisions unrelated to Policy 683, and

8

therefore the 17 grievants' claim is a matter suitable for arbitration as provided in the collective bargaining agreement. In reaching this conclusion, we look not to the arbitrator's framing of the issue, but instead to whether the factual situation that gave rise to the complaint, as well as the rights that were allegedly abridged, are within the scope of the collective bargaining agreement's arbitration clause as interpreted by the court. See J. J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315, 319 (4th Cir. 1988) (noting that the arbitrability determination centers on "whether the factual allegations underlying the claim are within the scope of the arbitration clause, regardless of the legal label assigned to the claim").

IV

Having thus concluded that the grievance in this case was arbitrable, we must still determine whether the arbitrator's award drew its essence from the collective bargaining agreement. See Misco, 484 U.S. at 36 (noting that an arbitrator's award must "draw[ ] its essence from the collective bargaining agreement" and not from "his own brand of industrial justice" (internal quotation marks omitted)). On this issue, the arbitrator continued to misconstrue the grievants' claim as actually demanding stabilization bonuses under Policy 683, and through that misconstruction, the arbitrator exceeded the scope of his authority when he actually awarded those stabilization bonuses to the 17 grievants. Regardless of whether the arbitrator relied on the collective bargaining agreement or on Policy 683, his award failed to draw its essence from either agreement.

The arbitrator recognized that Policy 683 was executed between Champion and the Union to provide severance payments and stabilization bonuses to specific employees whose employment was terminated as a result of the shutdown of No. 14 Machine. Policy 683 provides explicitly that its benefits apply only to employees "whose employment is or will be terminated as a result of the Modernization Project" and can be granted only through December 31, 1993. Thus, the arbitrator correctly concluded that "[t]he only place the Stabilization Bonus is provided for is in [Policy No. 683], [and] [t]o qualify for the bonus, it must be shown that these employees were covered by [Policy 683]." The arbitrator also recognized that the 17 grievants before him were not terminated by the shutdown of No. 14 Machine

9

but were reclassified as a result of the across-the-board reduction in force. He found this as a fact, stating that the restructuring was undertaken "solely for economic purposes unrelated to the modernization project [represented by the close of No. 14 Machine]." But in order to circumvent the obvious conclusion that the grievants therefore were not eligible for stabilization bonuses under Policy 683, the arbitrator bypassed the language of Policy 683 and generally linked the reasons for Policy 683 to the reason for the general reduction in force. The arbitrator stated:

> [Policy No. 683] directly caused the closing of the No. 14 Pulp machine. This closing resulted in the actions taken against these employees. Thus, indirectly, these employees were affected by the closing of the No. 14 Pulp machine. The entire process is intricately intertwined. It is difficult to claim and justify not covering these employees under the stabilization bonus plan of [Policy 683].

Through this reasoning, the arbitrator concluded that employee benefits awardable under Policy 683 should be given to any employee whose job was eliminated, regardless of the employee's eligibility under the Policy. And in doing so, he went beyond the authorizing boundaries of that agreement and awarded stabilization bonuses to non-qualifying employees whose jobs were eliminated as a result of general economic conditions after the time for payment of the bonuses had expired. The arbitrator had no contractual authority from Policy 683 to make his award, and thus the award could not be justified by that Policy.

Because the award of stabilization bonuses to these grievants does not draw its essence from Policy 683, the award is only legitimate if it is derived from the terms of the underlying collective bargaining agreement. But this agreement makes no provision for stabilization bonuses of any kind. It is therefore not surprising that nowhere in his confusing and internally inconsistent ruling does the arbitrator mention any provisions of the collective bargaining agreement to support the award. In a section entitled "Relevant Contract Provisions" earlier in his written opinion, the arbitrator cites, without comment, Article XXX(B), the collective bargaining agreement's provision requiring communication between Champion and the Union on projected job

10

eliminations, but he never refers to it in the merits section of the award. See Clinchfield Coal Co. v. Dist. 28, United Mine Workers, 720 F.2d 1365, 1369 (4th Cir. 1983) (noting that"stating an issue without discussing it" does not provide an adequate contractual basis for an arbitration award).

Equally problematic is the arbitrator's failure to mention and to address Article VIII(F), the job bidding procedures actually invoked by the grievants and spelled out in the collective bargaining agreement. See Mountaineer Gas, 76 F.3d at 608 (noting that an arbitration award that "ignore[s] the plain language" of the collective bargaining agreement cannot stand). These procedures delineate the rights the grievants may have under the collective bargaining agreement. Failure to construe these contractual provisions is evidence of a basic abdication of an arbitrator's duty to apply the contract that governs the grievance. See Clinchfield Coal, 720 F.2d at 1369 ("Where, as here, the arbitrator fails to discuss critical contract terminology, which terminology might reasonably require an opposite result, the award cannot be considered to draw its essence from the contract").

Because the arbitrator failed to apply the underlying collective bargaining agreement and instead attempted to apply the terms of Policy 683 which, as he explicitly recognized, did not apply, the only inference we can draw is that his award was based on something other the collective bargaining agreement or Policy 683. It appears most likely that he drew on his own notions of fairness as revealed by his statement, "It is difficult to claim and justify not covering these employees under the stabilization bonus plan [of Policy 683]." Difficult or not to justify, these employees' grievance did not arise under Policy 683, and the arbitrator's personal notions of fairness cannot be the basis for awarding compensation to them under Policy 683. Because the arbitrator's award of stabilization bonuses failed to draw its essence from any applicable agreement, it is illegal and must be vacated.

V

This conclusion, however, does not end the matter. The 17 grievants filed an arbitrable claim for impairment of job bidding rights, which has not yet been arbitrated under the collective bargaining agreement. Having filed a grievance under the collective bargaining

11

agreement, the grievants are now entitled to pursue arbitration of that still-pending claim.

Accordingly, we vacate the arbitration award and remand this case to enable the 17 grievants to pursue a new arbitration of their grievance if they wish to do so.

<u>VACATED AND REMANDED</u>

12