UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

INTERNATIONAL CHEMICAL WORKERS
UNION COUNCIL OF THE UNITED
FOOD AND COMMERCIAL WORKERS;
INTERNATIONAL CHEMICAL WORKERS
UNION COUNCIL OF THE UNITED
FOOD AND COMMERCIAL WORKERS,
Local Union No. 45C,
              *Plaintiffs-Appellants,*

v.

PPG INDUSTRIES, INCORPORATED,
              *Defendant-Appellee.*

No. 03-1638

Appeal from the United States District Court
for the Northern District of West Virginia, at Wheeling.
Frederick P. Stamp, Jr., District Judge.
(CA-01-142-5)

Argued: January 20, 2004

Decided: April 19, 2004

Before NIEMEYER, KING, and DUNCAN, Circuit Judges.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** August Randall Vehar, UFCW Assistant General Counsel, Office of General Counsel, INTERNATIONAL CHEMICAL

WORKERS UNION, Akron, Ohio, for Appellants. Charles David Morrison, STEPTOE & JOHNSON, P.L.L.C., Clarksburg, West Virginia, for Appellee. **ON BRIEF:** Robert W. Lowrey, UFCW Assistant General Counsel, Office of General Counsel, INTERNATIONAL CHEMICAL WORKERS UNION, Akron, Ohio, for Appellants. Carolyn A. Wade, STEPTOE & JOHNSON, P.L.L.C., Clarksburg, West Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

The International Chemical Workers Union Council of the United Food and Commercial Workers and its Local Union No. 45C (collectively "the Union") filed suit in the United States District Court for the Northern District of West Virginia seeking to vacate, in part, an arbitration award granted in favor of PPG Industries, Inc. ("PPG"). The Union appeals the district court's order granting summary judgment in favor of PPG. We agree with the district court that the arbitrator did not exceed the scope of authority given him by the parties' collective bargaining agreement, and that his decision properly drew its essence from that agreement. Accordingly, we affirm the district court's order in all respects.

I.

PPG operates a chemical manufacturing plant in Natrium, West Virginia. The Union represents the production and maintenance employees at the PPG plant, including a group of employees known as "instrumenticians." These employees inspect, maintain, and repair various safety relief valves at the plant. The safety relief valves are mechanical devices used to release pressure within pipes carrying potentially hazardous materials at the facility. In the event of an unex-

pected build-up of pressure within a vessel or pipe, the valves function as "the last line of defense" to protect PPG employees from serious injury or even death. J.A. at 283-84.

There are approximately 650 safety relief valves at the Natrium, West Virginia Plant. In 1997, the Union discovered that PPG was sending some of these valves off-site to be inspected and repaired by outside shops. The Union believed that PPG's practice of subcontracting out this work traditionally performed by Union employees violated the terms of the parties' collective bargaining agreement ("CBA"). Consequently, the Union filed Grievance No. G-15-97 under the grievance procedures laid out in the CBA. On August 5, 1999, during negotiations leading up to a successor CBA, the parties reached a settlement concerning Grievance No. G-15-97 ("the Settlement Agreement").

The parties agree that under the Settlement Agreement, PPG was authorized to contract out the testing and repair work for all "PSM," "CRT," and "Section I" safety relief valves. J.A. at 562-63. This group comprised about 130 of the 650 valves at the plant. PPG insisted on the right to subcontract the work on these valves as regulations issued by the Occupational Safety and Health Administration ("OSHA") required employers to "VR-certify" the repair of PSM, CRT, and Section I valves. J.A. at 26-27. The VR-certification process "provides a paper trial to document the source of the valve repaired . . . and the source of all parts to that valve." Br. of Appellant at 7-8 n.6. At all times relevant to these proceedings, the PPG plant did not possess the capability to VR-certify safety relief valves. The Settlement Agreement required PPG to provide the Union with a quarterly list of all valves sent out for repair by VR-certified shops.

The parties disagree over the remaining 520 non-PSM, non-CRT, and non-Section I valves (the "non-valves"). The Settlement Agreement is silent as to how the parties agreed to handle the non-valves. The Union contends that it understood the Settlement Agreement to provide that the non-valves would continue to be repaired and maintained in-house. On the other hand, PPG contends that it agreed to make every effort to keep the repair work for the non-valves in-house while it studied the possibility of attaining VR-certification capabilities at the PPG plant. PPG contends that the only restriction on its

power to subcontract valve work was contained in Article XIX, Paragraph 9 of the CBA, which granted PPG "the right to sub-contract work where the purpose and intent is not to reduce the regular working force." J.A. at 508.

The Union filed another grievance on August 8, 2000, Grievance No. G-20-00, alleging that PPG was violating the Settlement Agreement by subcontracting the repair work for the non-valves. J.A. at 548. Grievance G-20-00 was filed in accordance with the grievance procedures established under the successor CBA, which became effective on August 18, 1999. This grievance was not settled but, rather, proceeded to final and binding arbitration. A hearing on the Union's grievance was held on June 29, 2001 before arbitrator Howard D. Silver, who rendered a decision and award on September 10, 2001.

While the arbitrator found that "the Union had reason to conclude that the sub-contracting out would be limited to about 131 valves," J.A. at 39, he concluded that the Settlement Agreement was unenforceable for two reasons. First, he found that the Settlement Agreement would contravene a strong public policy expressed in OSHA regulations and private industry standards promoting the safety of factory workers. Arbitrator Silver stated that

> the nature of the work to be performed by the safety relief valves is so inextricably bound up with the safety of workers at the Natrium plant that these valves are the subject of a strong public policy expressed through OSHA regulations and other public laws imposing greater regulation of the inspection, preventive maintenance, and repair of these valves. The present industry standards strongly recommend testing by VR-certified staff . . . . No agreement between an employer and a union is sufficient to overcome the strong public policy in support of better testing, better skills in testing, and better facilities in testing.

J.A. at 40.

Second, the arbitrator refused to enforce the Settlement Agreement on the grounds that it "directly affects express language in the parties'

collective bargaining agreement." J.A. at 41. Specifically, Arbitrator Silver found that he could not enforce the terms of the Settlement Agreement without modifying the language of the CBA, specifically Article XIX, Paragraph 9, which authorized PPG to subcontract work if its purpose was not to reduce the labor force. He stated that:

> If the arbitrator were to enforce the agreement between the parties as urged by the Union in this case, the arbitrator would order the parties to assume a result which could only be reached, in the absence of the Employer's intention to reduce the regular working force, by modifying language within the parties' collective bargaining agreement, specifically Article XIX, paragraph 9. Modifying the language of the collective bargaining agreement between the parties is an action expressly withheld from the arbitrator by the parties' collective bargaining agreement. The arbitrator is without the authority to make such a modification.

J.A. at 41. Thus, Arbitrator Silver concluded that the subcontracting of the non-valves did not violate the CBA, and he accordingly issued an award denying the Union's grievance.

On December 10, 2001, the Union filed a complaint in the district court pursuant to § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, seeking to vacate, in part, the arbitration award. The Union sought to vacate the portion of the arbitration decision which concluded that public policy interests in favor of promoting worker safety precluded enforcement of the Settlement Agreement. With regard to the arbitrator's conclusion that he could not enforce the Settlement Agreement in light of Article XIX, Paragraph 9 of the parties' CBA, the Union requested an order of specific performance from the trial court enforcing the terms of the Settlement Agreement as "a contract separate and apart from the CBA . . . ." J.A. at 78.

PPG answered the complaint and filed a counterclaim against the Union requesting that the arbitration award be enforced. The parties subsequently filed cross motions for summary judgment. On April 24, 2003, the district court granted summary judgment in favor of PPG on the grounds that "the arbitrator had the authority to make his pub-

lic policy findings and that there was evidence to support the arbitrator's findings in this regard." J.A. at 234. The court further concluded that in view of the "considerable weight to be afforded an arbitrator's decision," the Union presented no grounds to vacate the arbitrator's public policy findings. J.A. at 234-35. Having affirmed the arbitrator's award on this ground, the district court found it unnecessary to address the Union's argument that the Settlement Agreement should nevertheless be enforced as a separate contractual agreement between the parties.

This appeal followed.

## II.

Although we review the district court's order granting summary judgment de novo, *see Gen. Drivers, Local Union No. 509 v. Ethyl Corp.*, 68 F.3d 80, 83 (4th Cir. 1995), "judicial review of an arbitration award is among the narrowest known to the law." *Richmond, Fredericksburg & Potomac R.R. Co. v. Transp. Communications Int'l Union*, 973 F.2d 276, 278 (4th Cir. 1992) (internal quotation marks omitted). We have consistently observed that "arbitration must be final to be effective. Permitting judicial second-guessing of arbitral awards would transform a binding process into a purely advisory one, and ultimately impair the value of arbitration for labor and management alike." *Westvaco Corp. v. United Paperworkers Int'l Union ex rel. Local Union 676*, 171 F.3d 971, 974 (4th Cir. 1999) (citation omitted) (internal quotation marks omitted). Therefore, we "do[ ] not sit to hear claims of factual or legal error by an arbitrator, and must defer to the arbitrator as long as the arbitrator is even arguably construing or applying the contract." *Champion Int'l Corp. v. United Paperworkers Int'l Union*, 168 F.3d 725, 728 (4th Cir. 1999) (internal quotation marks omitted).

In essence, "we must determine whether the arbitrator did his job — not whether he did it well, correctly, or reasonably, but simply whether he did it." *Mountaineer Gas Co. v. Oil, Chem. & Atomic Workers Int'l Union*, 76 F.3d 606, 608 (4th Cir. 1996). However, notwithstanding the exceedingly narrow scope of our review on appeal, we "must vacate [the] arbitrator's award if it violates clearly established public policy, fails to draw its essence from the collective bar-

gaining agreement, or reflects merely the arbitrator's personal notions of right and wrong." *Champion Int'l*, 168 F.3d at 729. In the light of these well-established principles, we consider the merits of the Union's appeal.

As noted earlier, the district court granted summary judgment to PPG on the grounds that the CBA authorized the arbitrator to make his public policy findings, and that the evidence supported his conclusion that a strong public policy in favor of promoting worker safety precluded enforcement of the Settlement Agreement. The Union contends, however, that the arbitrator exceeded his authority under the CBA because "whether an arbitration award or contract should not be enforced for 'public policy' reasons is an issue reserved to the courts." Br. of Appellant at 23. It is indeed true that the question of whether a collective bargaining agreement or an arbitration award violates public policy "is ultimately one for resolution by the courts." *W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber Workers*, 461 U.S. 757, 766 (1983). That principle, however, is not implicated by the facts before us. Arbitrator Silver relied on his public policy findings in reaching his decision and issuing the arbitration award. At no point did he purport to invalidate the parties' CBA, much less his own arbitration award on the grounds that it violated public policy.

Next, the Union argues that the arbitrator did not have evidence to support his public policy findings. Specifically, it argues that the OSHA regulations cited by the arbitrator were applicable only to the PSM, CRT, and Section I valves — valves that are not at issue in this appeal. Thus, the Union argues that there was no evidence that the use of Union instrumenticians to test and repair the non-valves would violate any law or public policy. Arbitrator Silver, however, found evidence of a public policy supporting worker safety not only in the mandatory OSHA regulations, but also in private industry recommendations promoting "better testing, better skills in testing, and better facilities in testing" all safety relief valves. J.A. at 40. The arbitrator's reliance on non-binding private industry recommendations in this manner was not inappropriate. We have previously held that "in the absence of any express limitation or reservation included in the grievance, we presume that the parties, who agreed to arbitration, agree that the authority to address everything necessary to resolve the par-

ticular grievance is conferred upon the arbitrator." *Yuasa, Inc. v. Int'l Union of Elec. Workers, Local 175*, 224 F.3d 316, 321 (4th Cir. 2000).

Finally, the Union argues that the district court erred in refusing to order the specific performance of the Settlement Agreement. The Union contends that the arbitrator's decision that PPG did not violate the CBA is not final and binding with respect to PPG's alleged breach of the Settlement Agreement. More precisely, the Union argues that the issue before the arbitrator was simply whether PPG's conduct violated the CBA, and because the Settlement Agreement was a contract "separate and apart" from the CBA, the arbitrator's determination that the CBA had not been violated did not dispose of the Union's complaints regarding the Settlement Agreement. Thus, the Union argues that notwithstanding the arbitration decision, the trial court should have enforced the "separate" Settlement Agreement limiting PPG's power to subcontract valve work.

Whether the August 1999 settlement of grievance G-15-97 is, as the Union contends, an agreement "separate and apart" from the collective bargaining agreement is ultimately of no consequence since the Union submitted its grievance concerning PPG's subcontracting of the non-valves to Arbitrator Silver for final and binding arbitration. The Union pursued its grievance to arbitration with the understanding that, under the express terms of the parties' CBA, only grievances involving alleged violations *of the CBA* could be submitted to arbitration.* At no point during the arbitration proceedings did the Union claim that its grievance concerning the Settlement Agreement was outside the scope of the CBA or otherwise not properly before the arbitrator for final review and disposition. It is well-established that "when a party consents to arbitration it cannot attack the award on grounds not raised before the arbitrator." *District 17, United Mine Workers of America v. Island Creek Coal Co.*, 179 F.3d 133, 140 (4th Cir. 1999). Moreover, the Union's argument is undermined by its admission that "the Arbitrator was given authority by the parties to

---

*Article VII, Paragraph 1 of the CBA provided that "[o]nly grievances involving alleged violations with respect to the application or interpretation of the terms of this agreement may be submitted by either party to arbitration." J.A. at 482.

decide if there was a settlement, how that Settlement should be interpreted, and whether the Settlement was violated." J.A. at 79-80 (emphasis removed).

## III.

Ultimately, the Union received a fair hearing before an impartial arbitrator concerning its claim that the Settlement Agreement had been breached. We are persuaded that his decision "dr[ew] its essence from the collective bargaining agreement," *Yuasa*, 224 F.3d at 321, namely, Article XIX, Paragraph 9 of the CBA, which authorized PPG "to sub-contract work where the purpose and intent [was] not to reduce the regular working force." J.A. at 508. Accordingly, we affirm the district court's order granting summary judgment in favor of PPG.

*AFFIRMED*