COCA–COLA BOTTLING COMPANY
OF ST. LOUIS, Appellee,

v.

TEAMSTERS LOCAL UNION NO. 688,
affiliated with International Brother-
hood of Teamsters, Chauffeurs, Ware-
housemen & Helpers of America, AFL–
CIO, Appellant.

No. 91–2876.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 13, 1992.

Decided March 26, 1992.

Clyde E. Craig, St. Louis, Mo., argued (Robert K. Sweeney, on brief), for appellant.

Ronald G. Ingham, Chattanooga, Tenn., argued (Karen M. Sutton, Chattanooga, Tenn. and John J. Moellering, St. Louis, Mo., on brief), for appellee.

Before BOWMAN, WOLLMAN, Circuit Judges, and WOODS,* District Judge.

BOWMAN, Circuit Judge.

This is an appeal from the District Court's [1] decision granting summary judgment in favor of the Coca–Cola Bottling Company of St. Louis (Company) and vacating a labor arbitrator's award. We affirm.

The appellant in this action, Teamsters Local Union No. 688 (Union), is the bargaining representative of Coca–Cola employee Kenneth Youngermann. Youngermann was employed as a driver under the terms of a collective bargaining agreement between the Union and the Company from 1984 until his termination on May 1, 1989. Youngermann's relationship with his employer was not without its difficulties and in fact was strained throughout much of his employment.

Company rules provide for a progressive disciplinary system, with five levels of increasingly severe punishment for successive violations of category A rules.[2] The levels of discipline for such violations progress from warnings through suspension to the discipline set out for the fifth (and ordinarily final) offense: "Immediate

---

* The HONORABLE HENRY WOODS, United States District Judge for the Eastern District of Arkansas, sitting by designation.

1. The Honorable Jean Hamilton, United States District Judge for the Eastern District of Missouri.

2. There are also rules categories B and C for which there are fewer or no levels of progressive discipline, as violations of these rules are considered more serious. Termination is thus an option after only one or two violations of rules in categories B and C.

suspension, without compensation, pending investigation for termination." Arbitration Opinion and Award at 10, *reprinted in* Appendix at 10, 19.[3] Category A rules include A–1, each driver is responsible for keeping his assigned vehicle clean at all times; A–10, employees must punch their timecards when leaving work; and A–18, employees are required to follow designated safety procedures. *Id.* at 11, *reprinted in* Appendix at 20. It is Youngermann's alleged violations of these three rules that finally resulted in his discharge.

By August 16, 1988, Youngermann had progressed through the first four levels of discipline for category A rules violations. Between August 16 and September 6, 1988, Youngermann reached level five as a result of several rules violations, including two incidents involving customers who requested that Youngermann no longer service their accounts. On September 6, Youngermann met with two Union stewards and three Company representatives to discuss the action to be taken pursuant to level five of the disciplinary system—termination.

The denouement of that meeting was not Youngermann's termination, as clearly contemplated by the rules, but instead a "Disciplinary Action Notice." The notice set forth an agreement entered into "[p]ursuant to the Union's recommendation" that imposed upon Youngermann a ten-day suspension without compensation for violation of rule A–25 (poor work performance), and also disqualified him from working as extra relief driver. Disciplinary Action Notice of September 6, 1988, *reprinted in* Appendix at 8. The notice continued:

> Notwithstanding the above discipline, please be advised that the Company considers a continuation of poor work performance, including carelessness, inefficiency, and inattention to duties to be intolerable, warranting termination of [sic] next such occurrence. Accordingly, by issuing the above discipline, the Company is not and does not waive its right

to administer greater disciplinary action for similar infractions by any employee in the future.

\*     \*     \*     \*     \*     \*

*Final Notification*

> Any such offense of a similar and/or like nature in violations [sic] of Category A Rules and Regulations will warrant your termination of employment with Coca–Cola Bottling Company of St. Louis.

*Id.*, *reprinted in* Appendix at 8–9. The Union stewards and two of the Company representatives signed the notice; Youngermann, although present, refused to sign.

In December 1988, Youngermann received a forty-day suspension without pay. (The arbitrator denied Youngermann's grievance challenging this suspension.) On April 19, 1989, Youngermann and a shop steward were called to a counseling (as opposed to disciplinary) meeting with Company representatives. The counseling was not well-received by Youngermann, and one of the Coca–Cola representatives lost his temper and suspended Youngermann for "insubordination." On April 26, a Disciplinary Action Notice was completed noting three category A rules violations: failure to complete accurately a Department of Transportation form on April 14, 1989 (rule A–18); failure to clock out on April 18, 1989 (rule A–10); and failure to maintain the interior of the assigned vehicle on April 19, 1989 (rule A–1). Youngermann was discharged on May 1, 1989.

In accordance with the terms of the collective bargaining agreement between the Union and Coca–Cola, the Union filed on Youngermann's behalf a series of eleven grievances that went to arbitration.[4] The arbitrator sustained Youngermann's grievance concerning the discharge and ordered him reinstated with back pay. Coca–Cola appealed to the District Court seeking to have the arbitration award vacated. The District Court, in an unpublished memoran-

---

**3.** There were provisions in the rules that aborted an employee's progression through the five levels of discipline when the last offense became stale. Thus an individual could purge his

record of prior violations if a certain amount of time passed without another.

**4.** This appeal is limited to the award as it relates to the discharge grievances.

dum and order, granted summary judgment to Coca–Cola and vacated the award. This appeal followed.

Because this case was decided on cross-motions for summary judgment, the parties agree there are no disputed issues of material fact. The question remains whether the District Court was correct in holding that Coca–Cola was entitled to judgment as a matter of law. We review the District Court's legal conclusions *de novo.*

Federal labor law is noteworthy for its strong public policy in favor of the private resolution of labor disputes without resort to the courts. *See, e.g., United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960). The courts' review of arbitration awards is exceptionally narrow. Where parties have a bargained-for agreement to resolve disputes via arbitration, courts ordinarily must defer to the resolution reached by the mutually agreed-upon arbitrator who typically has special knowledge of the arena in which the dispute arose. "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 371, 98 L.Ed.2d 286 (1987).

While the scope of review of an arbitrator's award is sharply limited, there are circumstances (in addition to fraud or the arbitrator's dishonesty, *see id.*) where a court may reverse an arbitration decision. "The arbitrator may not ignore the plain language of the contract...." *Id.* "[H]e does not sit to dispense his own brand of industrial justice." *Enterprise Wheel,* 363 U.S. at 597, 80 S.Ct. at 1361. The "award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words

manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." *Id.* We agree with the District Court that here the arbitrator went beyond the essence of the applicable agreement in crafting this award.

The basis for our decision is the agreement executed by the Union stewards and the Company representatives at the time Youngermann reached the fifth and final level of discipline. At this level he was subject to discharge, and the agreement, while giving him another opportunity to correct the deficiencies in his job performance, provided for his discharge in the event he did not.[5] This agreement clearly was a "last chance" agreement, that is, a "contract[ ] between [employer] and employee to suspend disciplinary action pending a probationary period in which the employee is afforded a chance to improve his or her performance." *United States Dep't of the Air Force v. Federal Labor Relations Auth.,* 949 F.2d 475, 477 (D.C.Cir. 1991). "If the employee fails to measure up as promised in a last chance agreement, the [employer] may proceed to administer the discipline earlier suspended," *id.* at 478, without reference to the collective bargaining agreement. Here, Coca–Cola, finding rules violations by Youngermann subsequent to the date of the last chance agreement, proceeded to terminate Youngermann.

■ Although the arbitrator's opinion discusses at some length the topic of just cause to terminate under the collective bargaining agreement, *see* Arbitration Opinion and Award at 39–42, *reprinted in* Appendix at 48–51, "just cause" under the terms of the collective bargaining agreement was irrelevant to Youngermann's discharge pursuant to the last chance agreement and should not have been considered. The last chance agreement superseded the collective bargaining agreement.[6] *See Ohio Edison*

---

5. Although Youngermann refused to sign the agreement, the validity or binding force of the agreement upon Youngermann, acknowledged by the arbitrator, *see* Arbitration Opinion and Award at 43, *reprinted in* Appendix at 10, 52, is not an issue in this appeal.

6. Youngermann's discharge letter from the Company does reference the collective bargaining agreement, stating that the termination is "in accordance with" Article 43 of the collective bargaining agreement. Arbitration Opinion and Award at 35, *reprinted in* Appendix at 10, 44.

*Co. v. Ohio Edison Joint Council,* 947 F.2d 786, 787 (6th Cir.1991) ("normally last chance agreements are binding in arbitration"); *Tootsie Roll Indus. v. Local Union No. 1, Bakery Workers' Int'l Union,* 832 F.2d 81, 84 (7th Cir.1987) (arbitrator's award was properly denied enforcement where he "based his award on a policy outside the letter agreement"); *Bakers Union Factory, #326 v. ITT Continental Baking Co.,* 749 F.2d 350, 354 (6th Cir. 1984) ("When a party claims that the chosen means of dispute resolution is private settlement, we have no reason to defer to the arbitrator's decision."). Thus the bargained-for last chance agreement controls our review of the arbitrator's award, which we cannot sustain if we are persuaded the arbitrator went outside that agreement in constructing the award.

■ Indisputably, there are arbitrable issues here: whether the alleged triggering event, as defined by the agreement, actually occurred and whether, according to the agreement, that event really was a triggering event—an "offense of a similar and/or like nature in violations [sic] of Category A Rules and Regulations." Disciplinary Action Notice of September 6, 1988, *reprinted in* Appendix at 8, 9. The arbitrator's "determinations [on these issues] retain the benefit of a deferential standard of review." *Bakers Union,* 749 F.2d at 356. The arbitrator correctly noted that he also had authority, upon finding a rules violation had occurred, to determine "proportionality of discharge *unless the contract mandates an exclusive remedy."* Arbitration Opinion and Award at 40, *reprinted in* Appendix at 10, 49 (emphasis added). Here, of course, the last chance agreement did set out an exclusive remedy upon the next violation—termination. Having reviewed the arbitration opinion, we hold that the arbitrator went outside the last chance agreement by rejecting the bargained-for

Article 43 lays out the progressive discipline scheme. Collective Bargaining Agreement at 46–47, *reprinted in* Appendix at 124, 172–73. Article 13 of the agreement discusses discharge for just cause. *Id.* at 12, *reprinted in* Appendix at 138. It is not mentioned in the discharge letter.

remedy, notwithstanding his determination that a category A rules violation, a triggering event, had occurred.

The arbitrator determined that Youngermann's error on the Department of Transportation form was an inadvertent transposition of numbers within the vehicle identification number required on the form. While in fact the error did occur, the arbitrator found *"no* infraction of rule A–18 with respect to the DOT form." *Id.* at 49, *reprinted in* Appendix at 58. As for the violation of rule A–1, concerning the condition of Youngermann's truck, the arbitrator found "that the Company failed to prove that the Grievant violated rule A–1." *Id.* at 49–50, *reprinted in* Appendix at 58–59. These determinations, going as they do to what the parties agree are arbitrable issues, we review under the highly deferential standard ordinarily applicable to arbitration awards. While we may not agree with the arbitrator's findings on these issues, we "may not reject those findings simply because [we] disagree[ ] with them." *Misco,* 484 U.S. at 38, 108 S.Ct. at 371.

On Youngermann's third alleged violation the arbitrator found that "[f]ailure to clock out is a violation of rule A–10." Arbitration Opinion and Award at 50, *reprinted in* Appendix at 10, 59. He also found that Youngermann in fact had failed to clock out. But because Youngermann himself had told management of the violation, because Youngermann "did not intend to gain anything by failing to clock out," and because there is no record of management reacting to the violation when first advised of it, the arbitrator declared it "de minimis." *Id.*[7]

Although he found that Youngermann had violated the rules, the arbitrator nevertheless reversed the discharge in contravention of the plain language of the last

7. Evidently this finding of degree had no bearing on the arbitrator's final decision, as indeed it could not. The arbitrator's authority was to determine whether or not Youngermann had violated a category A rule. The relative seriousness of the violation was not an issue under the terms of the last chance agreement.

chance agreement.[8] The arbitrator attempted to disguise his venturing outside the agreement by finding *"as a fact* that the three alleged infractions represented— cumulatively—the triggering event for discharge in this arbitration." *Id.* at 49, *reprinted in* Appendix at 58 (emphasis added). He reached this conclusion because there was "no support for the proposition, which in fact was not explicitly made, that the Grievant would have been discharged for any one of the alleged infractions had it been the only infraction." *Id.* Because only one violation had occurred (and a purportedly "de minimis" one at that), he reasoned, "there was no factual or contractual basis for any discipline." *Id.* at 50, *reprinted in* Appendix at 59.

If this were in reality a factual finding by the arbitrator, we would be obliged to give it the highest deference. *See Franklin Elec. Co. v. International Union, UAW*, 886 F.2d 188, 192 (8th Cir.1989). But labeling this a finding of fact does not make it so. The arbitrator found a rules violation, and termination was the bargained-for result. The language of the last chance agreement upon this issue is unambiguous; it says nothing about multiple violations being required to activate the remedy therein. The arbitrator did not have authority to alter the agreement by interpreting unambiguous language in a way contrary to its plain meaning, while attempting to characterize his actions outside of his authority as fact-finding. *See Northwest Airlines v. International Ass'n of Machinists Workers, Air Transport Dist. Lodge #143*, 894 F.2d 998, 1000 (8th Cir.1990). "[T]he language of the agreement is clear and unambiguous, and since the parties agreed to it, they are bound by it." *Tootsie Roll*, 832 F.2d at 84; *cf. Franklin Elec. Co.*, 886 F.2d at 193 ("Unlike the facts of *Tootsie Roll Industries*, where there was a special letter agreement

dealing specifically and unambiguously with one situation, here the terms of the CBA are not entirely unambiguous as they are intended to deal with all situations that arise during the employment relationship including layoffs.").

The arbitrator's disregard of the language of the last chance agreement concerning the consequences to Youngermann of a finding that he had committed a category A rules violation requires the reversal of his award. *See George A. Hormel & Co. v. United Food Workers, Local 9*, 879 F.2d 347, 351 (8th Cir.1989) ("We believe that where an arbitrator fails to discuss a probative contract term and at the same time offers no clear basis for how he construed the contract to reach his decision without such consideration, there arises a strong possibility that the award was not based on the contract.").

The judgment of the District Court is affirmed.

HENRY WOODS, District Judge, dissenting.

I must respectfully dissent. The majority correctly states that the Last Chance Agreement (LCA) superseded the Collective Bargaining Agreement. The majority also correctly states that appellate review of an award emanating from binding arbitration is extremely limited and must be affirmed so long as it draws its essence from the contract (in this case, the LCA).

To affirm the district court's decision to reverse the arbitrator's award, the majority relied on *its interpretation* of the LCA. The majority says, by way of a footnote, "We *believe* that [the Last Chance Agreement] is unambiguous, and therefore not susceptible of interpretation by the arbitrator, that the phrase 'offense of a similar and/or like nature' *warrants comparison*

8. We believe that it is unambiguous, and therefore not susceptible of interpretation by the arbitrator, that the phrase "offense of a similar and/or like nature" warrants comparison with offenses that are violations of "Category A Rules and Regulations," the passage that follows the comparative language in the last chance agreement, as opposed to comparison with some other offense undefined by the agreement. In any event, as discussed in the text of this opinion, it is apparent that the arbitrator did not base his decision on a conclusion that the rules violation he found to have occurred was not of "a similar and/or like nature" in comparison with some other violation.

with offenses that are violations of 'Category A. Rules and Regulations.'" Page 1442, n. 8 (emphasis added).

The fact is that the Last Chance Agreement, drafted by the employer, did not say the appellant would be discharged for a Class A rule violation. The Last Chance Agreement said the appellant would be discharged for an "offense of a similar and/or like nature." (The appellant's previous offense involved offensive and rude behavior toward customers.) The majority would have interpreted "offenses of a similar and/or like nature" to mean Category A offenses, but it is not this Court's duty to decide whether "like or similar" conduct "warrants comparison" with Category A offenses. This Court's review is limited to determining whether the arbitrator's decision ignored the LCA and, in effect, made an award in contravention of it.

The arbitrator's interpretation of the LCA in this case was reasonable. If the employer had intended the LCA to mean that the appellant would be dismissed for any Category A offense, however de minimis, then it should have said so. Be defining "dischargeable offense" as one of a "similar and/or like nature," the parties invited—and required—the Arbitrator to interpret that phrase. An arbitrator's interpretation of the parties' agreement in the context of binding arbitration is entitled to the greatest deference in all American jurisprudence. Furthermore, under the majority's decision the "similar and/or like" clause would have been superfluous, meaningless language.

Perhaps the most troubling repercussion of the majority's decision is that it opens the floodgates for appellate review of every routine arbitrator's award and effectively negates the "binding" aspect of binding arbitration. For these reasons, I respectfully dissent from the majority decision.