# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-2097

_____

| | | |
|---|---|---|
| Boise Cascade Corporation, | * | |
| | * | |
| Plaintiff/Appellee, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Paper Allied-Industrial, Chemical | * | District of Minnesota |
| and Energy Workers (PACE), | * | |
| Local 7-0159, | * | |
| | * | |
| Defendant/Appellant. | * | |

_____

Submitted: November 16, 2001
Filed : November 12, 2002

_____

Before BYE and BEAM, Circuit Judges, and GOLDBERG,[1] Judge.

_____

GOLDBERG, Judge.

Paper, Allied-Industrial, Chemical and Energy Workers (PACE), Local 7-0159 (the "Union"), appeals the order of the district court[2] vacating an arbitral award.

_____

[1]The Honorable Richard W. Goldberg, Judge, United States Court of International Trade, sitting by designation.

[2]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

Agreeing with the district court that the arbitrator's decision did not draw its essence from the Last Chance Agreement at issue, we affirm.

## I.    BACKGROUND

Appellee Boise Cascade Corporation ("Boise") employed Nancy Burmeister ("Burmeister"), a member of the Union, for nearly eleven years as a process operator in the mill department of its pulp and paper mill in International Falls, Minnesota. The terms and conditions of employment of Union members such as Burmeister are protected by a collective bargaining agreement ("CBA") between Boise and the Union.    This action arises out of Boise's decision to terminate Burmeister's employment, effective February 11, 2000.

Problems in Burmeister's employment began to arise long before Boise fired her. On October 26, 1996, Burmeister received a written warning from her supervisor for failing to report to work and failing to call in.  Less than a month later, she received another written warning for reporting to work one hour and fifteen minutes late, having unsuccessfully requested the day off after her shift was scheduled to begin.  On January 28, 1997, Burmeister called her supervisor after the start of her shift to inform him that she would be late due to "truck trouble"; she never reported to work and never called back that day.  Two days later, she was placed on a Last Chance Agreement[3] ("LCA") for excessive tardiness and absences; including the

---

[3]An LCA is

> a contract between employer and employee to suspend disciplinary action pending a probationary period in which the employee is afforded a chance to improve his or her performance.  If the employee fails to measure up as promised in a last chance agreement, the employer may proceed to administer the discipline earlier suspended, without reference to the collective bargaining agreement.

Coca-Cola Bottling Co. of St. Louis v. Teamsters Local Union No. 688, 959 F.2d

foregoing occasions, she had missed a total of forty-five days in the preceding thirteen months. Burmeister did not grieve either the LCA or the written warnings that preceded it. She satisfied the conditions that the LCA imposed upon her during a six-month probationary period, without incident.

On May 2, 1998, when Burmeister reported to work, Boise production manager Jim Larson ("Larson") noticed that her breath smelled of alcohol, her speech was slurred, and her mannerisms were different. Burmeister admitted to having recently consumed several beers, but a urine test showed that her blood alcohol content was actually 0.28, or nearly three times the legal limit for operating a motor vehicle in Minnesota. Although Burmeister was subject to immediate termination for this violation of Boise's Drug and Alcohol Policy, Boise agreed to place her on another LCA. This LCA required Burmeister to enroll in and complete a counseling program through Boise's Employee Assistance Program ("EAP"), and subjected Burmeister to two years of random drug and alcohol testing. Using language taken verbatim from her previous LCA, the LCA also provided:

> [Y]ou must understand that it is your responsibility and obligation to follow all published policies and procedures. Further violation of any mill rules and/or failure to comply with the Terms and Conditions of this Letter could result in your immediate termination. . . . Nancy, the Company's expectations are clear . . . your future with Boise Cascade is in your hands.

(second ellipsis in original). Burmeister and her Union representative had an opportunity to read the one-and-half-page LCA and to confer about it privately. As the arbitrator found, Burmeister had no questions about the LCA, fully understood what was required of her under it, and told Boise that she was "fine" with it. Burmeister, Larson, and her Union representative all signed the LCA.

---

1438, 1440 (8th Cir. 1992) (brackets, quotation marks, and citations omitted).

Gradually after the 1998 LCA was implemented, Larson and Burmeister's supervisor began to notice a pattern whereby Burmeister would call shortly before the start of her shift and request immediate vacation. On October 22, 1999, Burmeister failed to report to work, without warning. Well after her shift began, she called and requested immediate vacation, which Larson and her supervisor granted after conferring. Upon Burmeister's return to work, they met with her and the Union president and informed her that she was placing her job at grave risk by returning to her prior pattern of attendance problems, and specifically warned her not to miss any more shifts or make any more belated vacation requests. Burmeister admitted that she had violated Boise's unwritten rule requiring employees to notify the company of absences at least two hours prior to the start of a shift, and that her supervisors had showed leniency by not enforcing the LCA and terminating her for this violation of an unwritten attendance rule.

On Friday, February 11, 2000, Burmeister failed to report to work for her 6:00 a.m. shift. She had not phoned her supervisor in advance, and never did call in that day. Instead, around 8:40 a.m., Burmeister's supervisor received a call from Larry Matthews ("Matthews"), an EAP counselor. Matthews told the supervisor that Burmeister "could not keep the cap on the bottle" and that he was referring her for in-patient alcohol dependency treatment. Later that day, Matthews informed Boise's human resources manager that Burmeister had been unable to report to work because she had been drinking, and asked whether Burmeister could save her job if she entered an in-patient treatment facility that weekend. Burmeister ultimately did enter such a facility on Sunday, February 13, 2000.

The following Monday, Larson and the human resources director met with Union representatives to discuss Burmeister's situation. At the meeting, Larson explained that Burmeister had failed to report for work or call in beforehand; that according to Matthews, Burmeister's use of alcohol had prevented her from reporting to work; that Burmeister's absence was not due to her attendance at an in-patient treatment facility; and that after the October 22, 1999 incident, he had reminded

-4-

Burmeister of her obligation not to have any more attendance problems. The Union conceded each of these facts, but claimed that Burmeister should not be terminated because she had begun in-patient treatment the previous day. Nevertheless, after further consideration, Larson and Burmeister's supervisor terminated her employment, effective February 11, 2000. On February 15, 2000, the Union grieved Burmeister's termination, on the grounds that "because [Burmeister] is at this time taking part in an in patient treatment facility, [ ] she should not be terminated." The grievance was denied, and the Union appealed the matter to binding arbitration as provided by the CBA.

Arbitration was had on August 9, 2000, before Richard John Miller ("Arbitrator Miller"), who issued his written decision on September 14, 2000. Arbitrator Miller rejected the Union's assertion that he was entitled to decide whether there existed just cause for Burmeister's termination, observing that the LCA, rather than the CBA, governed the dispute. Thus, he found, the sole issue was whether Burmeister had violated the LCA. Without discussing the actual language of the LCA, the arbitrator construed it to prohibit violations only of written rules, and consequently determined that Burmeister's violation of Boise's unwritten attendance rules did not constitute a violation of the LCA. Arbitrator Miller further explained:

> [T]he reason for the Grievant's failure to personally call-in or be presence [sic] at work on February 11, 2000, cannot be construed as being frivolous. It is clear that the Grievant needed immediate assistance through the EAP on that day to get herself into an in-patient alcohol treatment program as soon as possible, since this disease was controlling both her personal and working relationships. There is nothing in the LCA which prevented the Grievant from seeking assistance through the EAP for her alcohol problem. The fact that she was not admitted to in-patient treatment until February 13, 2000, is a function of the availability of a suitable treatment center.

-5-

In sustaining the grievance, the arbitrator ordered Boise to reinstate Burmeister to her former position with full seniority and to pay her back wages from March 8, 2000, the date of her discharge from the in-patient treatment facility.

Boise brought suit in federal district court, seeking to have the arbitral award vacated. It filed a motion for summary judgment, and the Union filed a cross-motion requesting confirmation of the award. The district court granted Boise's motion and vacated the arbitral award, holding that the award failed to draw its essence from the parties' agreement. The court found that the plain language of the LCA did not support the arbitrator's decision; that the arbitrator failed to discuss the operative terms of the LCA; and that the arbitrator ignored the parties' intent when they entered into the LCA.

The Union timely appealed the district court's order. We have jurisdiction pursuant to 28 U.S.C. § 1291 (2000).

II.    DISCUSSION

In reviewing a district court's order confirming or vacating an arbitral award, we accept the court's findings of fact that are not clearly erroneous,[4] but decide questions of law de novo. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 947-48 (1995); accord Titan Wheel Corp. of Iowa v. Local 2048, Intern. Ass'n of Machinists, 253 F.3d 1118, 1119 (8th Cir. 2001). However, we must accord "an extraordinary level of deference" to the underlying award itself. Keebler Co. v. Milk

---

[4]The facts of this case are undisputed. In district court, the parties stipulated that the evidence and testimony submitted to the arbitrator, along with the arbitrator's findings of fact, would constitute the entire factual record on which the court could base its decision. We have adopted those facts in turn. In any event, we could not reject the arbitrator's findings of fact even if they were "improvident" or "silly." Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001); but see id. at 513 n.* (Stevens, J., dissenting) (noting ambiguity in this standard).

Drivers & Dairy Officials Union, Local No. 471, 80 F.3d 284, 287 (8th Cir. 1996). As the district court rightly observed, federal courts are not authorized to reconsider the merits of an arbitral award, "even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." Bureau of Engraving, Inc. v. Graphic Communication Int'l Union, Local 1B, 284 F.3d 821, 824 (8th Cir. 2002) (quoting United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 36 (1987)). Indeed, we must confirm the award even if we are convinced that the arbitrator committed serious error, so "long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority." Bureau of Engraving, 284 F.3d at 824 (quoting Misco, 484 U.S. at 38).

However, an arbitrator's decision is not totally free from judicial review, for "although the arbitrator's authority is broad, it is not unlimited." Missouri River Servs., Inc. v. Omaha Tribe of Nebraska, 267 F.3d 848, 855 (8th Cir. 2001) (internal brackets omitted) (quoting Trailmobile Trailer, LLC v. Int'l Union of Elec. Workers, 223 F.3d 744, 747 (8th Cir. 2000)), cert. denied 122 S. Ct. 1909. In addition to those grounds for vacation of an award set forth in the Federal Arbitration Act, 9 U.S.C. § 10 (2000) (listing such reasons as the arbitrator's corruption, fraud, evident partiality, misconduct, or ultra vires acts), courts have vacated arbitral awards that are "completely irrational" or that "evidence[] a manifest disregard for the law." Hoffman v. Cargill Inc., 236 F.3d 458, 461 (8th Cir. 2001) (quoting Val-U Constr. Co. v. Rosebud Sioux Tribe, 146 F.3d 573, 578 (8th Cir. 1998)). An award is "irrational where it fails to draw its essence from the agreement"; it "manifests disregard for the law where the arbitrators clearly identify the applicable, governing law and then proceed to ignore it." Id. at 461-62. "An arbitrator's award draws its essence from the [parties' agreement] as long as it is derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention." Johnson Controls, Inc., Sys. & Servs. Div. v. United Ass'n of Journeymen, 39 F.3d 821, 825 (7th Cir. 1994) (internal quotation marks omitted).

In this case, the district court found that the plain language of the LCA was unambiguous and was not susceptible of the arbitrator's interpretation that it prohibited violations of only published mill rules. The court found that while the first sentence of the relevant paragraph did instruct Burmeister to "follow all published policies and procedures," the second sentence enjoining her from "[f]urther violation of any mill rules" stood alone, and could not be read as referring only to published mill rules. The court further held that because the arbitrator failed to quote the relevant language and failed to discuss how he arrived at his interpretation, and because his interpretation contravened the parties' intent, the award did not draw its essence from the LCA.

If we owed aught but maximum deference to the arbitrator's ruling, we would likely affirm the district court's order vacating the arbitral award based on the plain text of the LCA alone. As the district court reasoned, the first sentence in question sets forth Burmeister's obligations under the LCA, and the second sentence explains the sanction attached to failure to adhere to those conditions or to any other violation of any mill rule.

However, it is not our construction of the LCA for which the parties bargained, but Arbitrator Miller's. See Trailmobile Trailer, 223 F.3d at 747. We may not vacate the award simply because we disagree with his interpretation, unless that interpretation so directly contradicts the plain meaning of the parties' agreement that it effectively rewrites it. See, e.g., Amalgamated Transit Union, Local No. 1498 v. Jefferson Partners, 229 F.3d 1198, 1200-01 (8th Cir. 2000) ("The arbitrator, however, is not free to ignore or abandon the plain language of the [parties' agreement], which would in effect amend or alter the agreement without authority." (internal quotation marks omitted) (citing Excel Corp. v. United Food & Commercial Workers Int'l Union, Local 431, 102 F.3d 1464, 1468 (8th Cir. 1996))); Coca-Cola Bottling Co. of St. Louis v. Teamsters Local Union No. 688, 959 F.2d 1438, 1440 (8th Cir. 1992) ("The arbitrator did not have the authority to alter the agreement by interpreting unambiguous language in a way contrary to its plain meaning."). Even if Arbitrator

Miller's interpretation does not rise to that level,[5] our inquiry--contrary to the contentions of the Union and the dissent–is not complete.

As we have previously recognized, "[i]f an arbitrator attempts to interpret a written agreement that is silent or ambiguous without considering the parties' intent, his award will fail to draw its essence from the [agreement]." Bureau of Engraving, Inc. v. Graphic Communications Int'l Union, Local 1B, 164 F.3d 427, 429 (8th Cir. 1999) (vacating awards that were inconsistent with the parties' past practices and their intent as evidenced by CBA negotiations). An arbitrator's paramount obligation is to apply the parties' agreement in a way that gives effect to their intent. Id. at 429 ("'[D]etermining the intent of the parties is the essential inquiry'; if the written agreement is silent, the arbitrator may consider past practice and bargaining history to fill gaps." (quoting CSX Transp., Inc. v. United Transp. Union, 29 F.3d 931, 936 (4th Cir. 1994))). In Int'l Woodworkers v. Weyerhaeuser Co., 7 F.3d 133 (8th Cir. 1993), we explained:

---

[5]Judge Beam reads the phrase "[f]urther violation of any mill rules . . . could result in your immediate termination" to be unambiguous and not susceptible of the arbitrator's interpretation, and would first affirm the district court on that basis. Post at 18. While I agree that the clause is clear, I also believe that its juxtaposition with the preceding reference to "published policies and procedures" imparts some measure of ambiguity. Of course "there are degrees of ambiguity and clarity in most language," Lattimer-Stevens Co. v. United Steelworkers Dist. 27, 913 F.2d 1166, 1171 (6th Cir. 1990) (Boggs, J., dissenting), but while the degree of ambiguity here is slight enough that I would readily adopt the district court's reading were our review of the award de novo, the standard we must apply is exceptionally forgiving. The plain text must be stretched to reach the arbitrator's interpretation, but not beyond its breaking point.

Whatever ambiguities lie within the four corners of the LCA, as discussed infra its meaning is plainly unambiguous when read in the context of the parties' history and intent, and by ignoring all evidence of that history and intent the arbitrator exceeded his authority. On this point Judge Beam and I are in complete agreement.

> [W]hen the arbitrator construed [an] ambiguous provision without seeking the parties' guidance as to its intent and without evidence of their relevant past practices, he acted without considering the entire agreement. In these circumstances we do not simply disagree with his interpretation of the Agreement; we conclude that he dispensed his own brand of industrial justice, and his award cannot be said to draw its essence from the collective bargaining agreement.

7 F.3d at 136-37 (internal citations omitted).

Noting that we have sometimes vacated arbitral decisions where the arbitrator strayed beyond the four corners of the parties' agreement, the Union argues that the arbitrator properly limited himself to the language within the LCA and rendered a reasonable interpretation of an ambiguous paragraph. This argument rests on a misunderstanding of our prior decisions. Certainly, we have vacated awards where the arbitrator ignored or went beyond the plain text of the parties' agreement, and that text was unambiguous. For example, in Keebler, we vacated an award because the arbitrator improperly looked to a settlement letter and past practice to discern the parties' intent when the CBA and an incorporated side agreement were unambiguous. We found that he was "not construing an ambiguous contract term, but rather was imposing a new obligation upon" the company. 80 F.3d at 288. See also Excel Corp., 102 F.3d at 1468 (vacating award where arbitrator relied on parole evidence though "the language of the contract is clear and unambiguous"); Coca-Cola, 959 F.2d at 1440-42 (arbitrator improperly ignored plain language of LCA); Anheuser-Busch, Inc. v. Local Union No. 744, 280 F.3d 1133, 1139 (7th Cir. 2002) (arbitrator may not consider law of shop if agreement is unambiguous), petition for cert. filed 71 U.S.L.W. 3240 (Oct. 7, 2002) (No. 02-143). In so doing, we have simply followed the longstanding principle that the arbitrator is not free to alter or amend the parties' agreement, unless expressly authorized to do so. Thus, where the plain text of the agreement is unmistakably clear, it is presumed to evince the parties' intent, and the

arbitrator normally need look no further, but must give effect to the parties' agreement as written.[6]

On the other hand, where the plain language of the parties' agreement is silent or ambiguous with respect to a disputed issue, an arbitrator is obliged to consider other relevant sources of the parties' intent. Graphic Communications, 164 F.3d at 429. An LCA, like the collective bargaining agreement that it supersedes,

> calls into being a new common law--the common law of a particular industry or of a particular plant. . . . [T]he labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law--the practice of the industry and the shop--is a part of the [LCA] although not expressed in it.

Jefferson Partners, 229 F.3d at 1201-02 (quoting Int'l Woodworkers, 7 F.3d at 135, quoting in turn United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 579 (1960)). See also Trailway Lines, Inc. v. Trailways, Inc. Joint Council, 807 F.2d 1416, 1423 (8th Cir. 1986) (by ignoring company's past practice of prohibiting beards on employees in contact with the public, arbitrator "ignored an extremely relevant source of common law--the law of the shop"). None of these extrinsic sources for divining the parties' intent "substitute[] for or supplant[] the language of the contract, but they all help interpret ambiguities in that language." NCR Corp., E & M Wichita v. Int'l Ass'n of Machinists, Dist. Lodge No. 70, 906 F.2d 1499, 1501 n.3 (10th Cir. 1990).

Thus, contrary to the Union's suggestion, federal courts routinely confirm arbitral awards where the arbitrator has looked to outside sources for guidance in

---

[6]In limited circumstances, even unambiguous language may be trumped by other evidence of the parties' intent if it is abundantly clear that the language does not reflect their intent. See Loveless v. Eastern Air Lines, Inc., 681 F.2d 1272, 1279-80 (11th Cir. 1982); but see Lyster v. Ryan's Family Steak Houses, Inc., 239 F.3d 943, 946 (8th Cir. 2001).

giving meaning to ambiguous language. See, e.g., Fairview Southdale Hosp. v. Minnesota Nurses Ass'n, 943 F.2d 809, 812 (8th Cir. 1991) (per curiam) ("[The] arbitrator did not violate the essence of the collective bargaining agreement by looking first to the agreement, and then beyond the agreement to past practices for resolution of an issue on which the agreement is ambiguous or silent."); CSX Transp., Inc. v. United Transp. Union, 29 F.3d 931, 936-37 (4th Cir. 1994); Manville Forest Products Corp. v. United Paperworkers Int'l Union, 831 F.2d 72, 76 (5th Cir. 1987); Ladish Co. v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. No. 10, 966 F.2d 250, 253 (7th Cir. 1992); NCR Corp., E & M Wichita v. Int'l Ass'n of Machinists, Dist. Lodge No. 70, 906 F.2d 1499, 1505-06 (10th Cir. 1990). Conversely, as noted above, we have vacated awards where the arbitrator failed to consider such sources when to do so was vital to determine the parties' intent. See, e.g., Graphic Communications, 164 F.3d at 429-30; Int'l Woodworkers, 7 F.3d at 135-37.[7]

---

[7]The dissent does not address any of the foregoing precedent, but simply recites Supreme Court cases restating the long-established principle that courts owe maximum deference to an arbitrator's decision and may not vacate an award so long as the "arbitrator is even arguably construing or applying the contract and acting within the scope of his authority." Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001), cited post at 19-20. As the above discussion makes clear, however, an arbitrator does not construe the contract and does not act within his authority when he either ignores unambiguous language or construes ambiguous language without any reference to the parties' intent.

The dissent is surely correct that an arbitrator's "mere failure to recognize a contract's ambiguity" does not in itself give cause for vacation of the award. As discussed infra at 14 n.9, courts may not vacate an award unsupported by any discussion of the arbitrator's reasons, so long as "its essence is consistent with the spirit and reason of the parties' agreement." See United Food & Commercial Workers, Local No. 88 v. Shop 'N Save Warehouse Foods, Inc., 113 F.3d 893, 897 (8th Cir. 1997). A fortiori, if the arbitrator fails to discuss a relevant ambiguity but the court's own review finds that extrinsic evidence of the parties' intent is itself ambiguous or silent or not plainly dispositive of the issue, the award will stand. On the other hand, if the arbitrator has ignored the ambiguity, and the court's own inquiry leads it to conclude that the arbitrator would likely have reached a different result had he recognized the ambiguity and sought to resolve it, then the award must be vacated.

Of course, the arbitrator must restrict his inquiry to evidence that will aid him in divining the parties' intent; he may not rely on outside sources not within the parties' contemplation at the time they drafted their agreement. Compare NCR Corp., 906 F.2d at 1501 (where plain language was unclear, arbitrator properly considered "other terms in the contract; the negotiating and contractual history of the parties, which would also help reveal their intent; evidence of past practices; [prior arbitral and judicial decisions]; and the common law of the shop"), with Alvey, Inc. v. Teamsters Local Union No. 688, 132 F.3d 1209, 1212-13 (8th Cir. 1997) (vacating arbitral decision that looked to Missouri state criminal and evidence law to determine that grievant placed on probation following guilty verdict was not "convicted"; "[i]nstead of looking at the word in context, taking into account its ordinary meaning and any pertinent plant practices or history, the arbitrator adopted his own, hyper-technical meaning derived from a contextually inapposite source").

In this case, Arbitrator Miller did not discuss the language concerning "any mill rules," did not recognize its ambiguity, and consequently did not consider other evidence of the parties' intent. Had he done so, yet still reached the same result, his decision would have rested on a legitimate interpretation of the parties' agreement. In the absence of other strong evidence that he was merely dispensing his own brand of industrial justice, we would be obliged to confirm the award, even if we disagreed with his reasoning and conclusion. Instead, given the decision's silence on this crucial issue, we cannot know whether Arbitrator Miller simply overlooked the obvious ambiguity or whether he obliquely construed it in a hyper-technical fashion, although his admission that the result "may be unfair" to Boise suggests the latter.[8]

Cf. Clinchfield Coal Co. v. Dist. 28, United Mine Workers, 720 F.2d 1365, 1369 (4th Cir. 1983) ("Where, as here, the arbitrator fails to discuss critical contract terminology, which terminology might reasonably require an opposite result, the award cannot be considered to draw its essence from the contract.").

[8]Arbitrator Miller explained that he "had no other alternative but to strictly interpreted the essence of the LCA, which unfortunately was to the detriment of the Employer who agreed to terminating the Grievant for only violations of published

-13-

In either event, "[w]e believe that where an arbitrator fails to discuss a probative contract term, and at the same time offers no clear basis for how he construed the contract to reach his decision without such consideration, there arises a strong possibility that the award was not based on the contract." George A. Hormel & Co. v. United Food & Commercial Workers, Local 9, 879 F.2d 347, 351 (8th Cir. 1989); accord Coca-Cola, 959 F.2d at 1442.[9]

---

rule and procedures." [sic]

[9]The Union suggests that because "[a]rbitrators need not even articulate reasons for their decisions," Hoffman, 236 F.3d at 463 (citing Alexander v. Gardner-Denver Co., 415 U.S. 36, 58 (1974)), we cannot rely on the arbitrator's failure to discuss the LCA's ambiguity as a basis to vacate the award. We reject that proposition out of hand. Certainly we will not vacate an award simply because an arbitrator does not issue a written decision or fully explain his reasoning, so long as "its essence is consistent with the spirit and reason of the parties' agreement." United Food & Commercial Workers, Local No. 88 v. Shop 'N Save Warehouse Foods, Inc., 113 F.3d 893, 897 (8th Cir. 1997) (explaining that arbitral decision may still draw its essence from the parties' agreement though it is poorly worded and its reasoning on subsidiary points is questionable).

However, where we have reason to suspect that the arbitrator's decision fails to draw its essence from the parties' agreement, we are not obliged to ignore our suspicions, even if they are based on deficiencies in the arbitrator's written decision. In such circumstances, federal courts have repeatedly vacated arbitral decisions that failed to discuss probative terms. See, e.g., Champion Int'l Corp. v. United Paperworkers Int'l Union, 168 F.3d 725, 731 (4th Cir. 1999) (arbitrator's failure to address certain contractual provisions was "evidence of a basic abdication of [his] duty to apply the contract that governs the grievance"); Hormel, 879 F.2d at 351-52; Clinchfield Coal Co. v. Dist. 28, United Mine Workers, 720 F.2d 1365, 1369 (4th Cir. 1983) ("Where, as here, the arbitrator fails to discuss critical contract terminology, which terminology might reasonably require an opposite result, the award cannot be considered to draw its essence from the contract."); see also Halligan v. Jaffray, 148 F.3d 197, 204 (2d Cir. 1998) ("[W]hen a reviewing court is inclined to hold that an arbitration panel manifestly disregarded the law, the failure of the arbitrators to explain the award can be taken into account."). Cf. American Nat'l Can Co. v. United Steelworkers, 120 F.3d 886, 893 (8th Cir. 1997) (confirming arbitral award despite its conflict with precedent because arbitrator "specifically identified the critical

While Arbitrator Miller may have mistakenly believed that he was required to give a strict interpretation of the LCA, however unfair the result to Boise, other language in his decision suggests that he was motivated to dispense his own brand of industrial justice. Although the arbitrator stated that the sole issue before him was whether Burmeister had violated the LCA, he effectively undertook a "just cause" analysis, finding that Burmeister's absence was not "frivolous" because her absence was caused by a desire to enter an in-patient counseling program.[10] The Union argues that Arbitrator Miller's discussion of the reason for Burmeister's absence constitutes an alternative basis for his award, on the grounds that the LCA's choice of modal verb in the phrase "could result in your immediate termination" vested discretion in the arbitrator to determine whether termination was appropriate. The Union's reliance on our decision in Trailmobile Trailer is misplaced, however; in that case, the arbitrator was interpreting a just cause provision in a CBA that expressly gave him such power. 223 F.3d at 745-46.

By contrast, an LCA such as the one at issue here renders the just cause provision in the parties' CBA irrelevant. See Coca-Cola, 959 F.2d at 1440 ("'[J]ust

---

factual differences"). The Union's suggestion that this principle creates an incentive for arbitrators to refuse to issue written decisions ignores the practical reality that any arbitrator who did so would suffer a grave loss of professional esteem among the parties, typically repeat players, that jointly contract for his services.

[10]This conclusion directly contradicted the arbitrator's finding of fact, conceded ab initio by the Union, that Burmeister's absence on February 11, 2000, was caused by her use of alcohol, rather than any in-patient treatment obligation. To be sure, an arbitral decision need not be a model of internal consistency or coherence, but where an arbitrator's conclusion is wholly inconsonant with his fact-finding, it suggests that he was not fulfilling his obligation to interpret and apply the parties' agreement. Cf. Excel Corp., 102 F.3d at 1469 (finding that arbitrator had dispensed his own brand of industrial justice, and noting that arbitrator's own factual findings directly contradicted his ultimate ruling); Iowa Mold Tooling Co. v. Teamsters Local Union No. 828, 16 F.3d 311, 312 (8th Cir. 1994) (vacating award where arbitrator "promptly abandoned his own admonition" to conform to federal law).

cause' under the terms of the collective bargaining agreement was irrelevant to [the grievant's] discharge pursuant to the last chance agreement and should not have been considered. The last chance agreement superseded the collective bargaining agreement."); Ohio Edison Co. v. Ohio Edison Joint Council, 947 F.2d 786, 787 (6th Cir. 1991) (arbitrator lacked authority to set aside last chance agreement on grounds that grievant's discharge was "too harsh"). Even a de minimis violation of an LCA entitles the employer to impose the sanction provided for under the LCA. See Coca-Cola, 959 F.2d at 1442; see also Tootsie Roll Indus., Inc. v. Local Union No. 1, 832 F.2d 81, 83-85 (7th Cir. 1987) (vacating arbitrator's decision that second absence, excusable under company's general attendance policy, did not violate LCA's ban on more than one absence per month "for any reason"). Indeed, Arbitrator Miller recognized that discretion to terminate Burmeister upon a violation of the terms of the LCA was vested solely in Boise. Thus, we find his discussion of her purportedly non-frivolous reason for being absent disturbing, as it suggests "efforts to balance the equities of the situation, rather than to interpret and apply the agreement." St. Louis Theatrical Co. v. St. Louis Theatrical Bhd. Local 6, 715 F.2d 405, 409 (8th Cir. 1983) (vacating arbitral award).

Had Arbitrator Miller considered the parties' intent in drafting the 1998 LCA, as informed by their past practice, we do not believe he would have reached the same result, for there is abundant evidence that the parties did not intend or understand the LCA to mean that Burmeister's violations of the unwritten attendance rules could not lead to her termination. To begin with, the plain language of the LCA becomes more meaningful when viewed in light of the history between the parties. The sentence that the arbitrator effectively ignored enjoins Burmeister from "[f]urther violation of any mill rules"; it plainly refers to rules that Burmeister had previously violated. Burmeister had previously received two written warnings and was placed on her first LCA for violations of Boise's unwritten attendance rules. The ambiguous paragraph at issue here was copied verbatim from the first LCA, which was created to address those violations. While Burmeister was placed on the second LCA because she came to work intoxicated, the parties clearly recognized the relationship between

-16-

Burmeister's abuse of alcohol and her attendance problems; it is absurd to suppose that they meant to address the one and not the other.

Any possible doubt as to the parties' understanding of Burmeister's obligations under the 1998 LCA is vitiated by her acknowledgment that her violation of attendance rules on October 22, 1999, warranted her termination under the terms of the LCA. The Union argues that Burmeister's understanding is irrelevant, as it made no such concession. However, Burmeister is an independent signatory of the 1998 LCA, so her understanding of its requirements is clearly relevant. We also note that the Union's own stated ground for grieving her termination was not that the LCA did not prohibit violations of Boise's unwritten attendance rules, but that she should not be terminated because she had begun in-patient treatment.[11] Nor did either Burmeister or her Union representatives demur when she was reminded, shortly after October 22, 1999, that further violations of Boise's attendance rules would be grounds for termination. The Union's post hoc rationalizations notwithstanding, it is clear that in adopting the 1998 LCA, Boise, Burmeister, and the Union all understood that Burmeister could be terminated for violations of Boise's unwritten attendance rules.

In this case, there is abundant evidence that the arbitrator's decision did not consider the parties' intent, that it contravenes that intent, and that "additional facts exist that strongly indicate that the arbitrator did not premise his award on the

[11]The Union argues that it was incumbent upon Boise expressly to provide that Burmeister could be terminated for violations of unwritten attendance rules. We disagree. We think it was reasonable for Boise to suppose that language taken verbatim from Burmeister's first LCA, which was intended to address Burmeister's attendance problems, would have the same effect when used in the second LCA. The one-and-a-half page LCA at issue here (unlike a typical CBA) was not intended to be a complex legal contract; in drafting it, Boise already had grounds to dismiss Burmeister, and was simply giving her a last chance to alter her behavior. For these reasons, we decline the Union's suggestion to apply the contract law principle that ambiguities should be interpreted to the detriment of the drafter.

contract, notwithstanding his words to the contrary." Hormel, 879 F.2d at 350 (emphasis omitted). In these circumstances, we do not merely disagree with the arbitrator's decision; rather, we find that his award fails to draw its essence from the parties' agreement. See Int'l Woodworkers, 7 F.3d at 136-37. Accordingly, we affirm the order of the district court vacating the arbitral award.

BEAM, Circuit Judge, concurring.

I am pleased to concur in the result reached by Judge Goldberg. However, I do so because I agree with the district court that the Last Chance Agreement (LCA) was unambiguous and was not susceptible to the arbitrator's interpretation that it prohibited violation of only published mill rules. However, I also agree with Judge Goldberg's conclusion that even if there is some measure of ambiguity in the LCA, the arbitrator attempted to interpret the LCA without proper consideration of the parties' intent, contrary to established precedent.

BYE, Circuit Judge, dissenting.

The majority rejects the arbitrator's reading of the Last Chance Agreement (LCA) because he failed to recognize and resolve an ambiguity by examining the parties' intent. From this analysis, the majority concludes the arbitrator's award "fails to draw its essence from the parties' agreement." Ante at 17. We cannot reject the arbitrator's reading of the parties' agreement merely because he failed to recognize an ambiguity. Nor does it follow that from such a failure the arbitral award fails to draw its essence from the parties' agreement. For both reasons, I respectfully dissent.

The majority acknowledges that the operative text in the LCA does contain "some measure of ambiguity." Id. at 9 n.5. I agree. Its reference to "any mill rule" comes directly after a statement that it will be Burmeister's responsibility to comply with *published* policies and procedures. This arrangement of text can reasonably be interpreted to mean that the type of "rules" referred to in the second sentence are more

-18-

specifically defined in the first sentence as all "published" policies and procedures. Because Burmeister's actions were not in violation of any published policy or procedure, the arbitrator reasonably concluded she did not violate the terms of the LCA.

Whether the arbitrator properly or improperly interpreted the LCA, there is no question the arbitrator endeavored to interpret the LCA. That was the parties' bargain, and therefore we should not interfere with the arbitrator's award. "A court cannot interfere with the arbitrator's award unless it can be said with positive assurance that the contract is not susceptible of the arbitrator's interpretation." United Food & Commercial Workers, Local No. 88 v. Shop 'N Save Warehouse Foods, Inc., 113 F.3d 893, 895 (8th Cir. 1997) (internal quotations and citations omitted); see Keebler Co. v. Milk Drivers & Dairy Employees Union, Local No. 471, 80 F.3d 284, 288 (8th Cir. 1996) ("We could not disturb the arbitrator's award if he interpreted ambiguous language in the collective bargaining agreement or side agreement to support his conclusion that Keebler could not transfer this account without the agreement of the Union, even if his interpretation of the agreement had been erroneous.").

In other words, this is not a case where an arbitrator ignored an ambiguity, and set aside his concomitant obligation to examine the parties' intent, in order to dispense his own brand of industrial justice. This is a case where an arbitrator undertook his obligation to construe and apply the parties' agreement, and in doing so deemed a provision in the agreement to be unambiguous by adopting a reasonable interpretation. While we can all agree the arbitrator failed to recognize the provision's ambiguity, that error does not justify our interference with the award. See Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001) ("Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement.").

Nor does it follow that by failing to recognize the provision's ambiguity, the arbitrator arrived at an award that failed to draw its essence from the agreement. The Supreme Court has stressed time and again "that if an 'arbitrator is *even arguably construing or applying the contract* and acting within the scope of his authority,' the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.'" Id. (quoting E. Associated Coal Corp. v. Mine Workers, 531 U.S. 57, 62 (2000) (in turn quoting Paperworkers v. Misco, Inc., 484 U.S. 29, 38 (1987)) (emphasis added). An arbitrator's mere failure to recognize a contract's ambiguity cannot and does not amount to a failure to construe or apply the contract. The majority's conclusion to the contrary ignores clear Supreme Court precedent, and thus I am obliged to dissent.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.