Robert G. MUNN, Plaintiff,

v.

KRAFT FOODS GLOBAL, INC., f/k/a Kraft Foods North America, Inc., Defendant.

No. 3:05–CV–00026–CFB.

United States District Court, S.D. Iowa, Davenport Division.

July 17, 2006.

·Earl A. Payson, Davenport, IA, for Plaintiff.

Christian M. Poland, Bryan Cave LLP, Chicago, IL, Peter J. Thill, Betty Neuman & McMahon, Davenport, IA, for Defendant.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

BREMER, United States Magistrate Judge.

The Court has before it Defendant's Motion for Summary Judgment (Clerk's No. 36) filed on February 24, 2006. At the hearing on May 9, 2006, Earl A. Payson represented Plaintiff, and Christian M. Poland represented Defendant.

In Count I of his Amended Complaint, Plaintiff, Robert G. Munn, alleges his former employer, Defendant Kraft Foods Global, Inc., violated Iowa Code § 730.5 (2003), which governs drug testing of employees in the private sector. Kraft fired Munn because he refused his supervisor's request to undergo drug testing following an accident that damaged property in the workplace. Munn seeks compensatory and punitive damages.[1] In its Motion for Summary Judgment, Kraft asserts that no genuine issues of material fact are in dispute and it is entitled to judgment as a matter of law on Munn's claim.

The case was referred on July 21, 2005, to a United States Magistrate Judge for the conduct of all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c), and the parties' consent. This matter is fully submitted.

After carefully considering the evidence in the record and the parties' memoranda

---

1. On January 30, 2006, the parties filed a Stipulated Dismissal With Prejudice of Munn's claim for wrongful discharge, which constituted Count II of the Amended Complaint.

and arguments, the Court finds and holds as follows on the issues presented.

## I. STANDARD FOR SUMMARY JUDGMENT

In determining whether to grant Kraft's Motion for Summary Judgment, the Court must first examine the record to see whether Kraft, "in depositions, answers to interrogatories, admissions, affidavits and the like, has demonstrated 'the absence of a genuine issue of material fact' " and "entitlement to judgment as a matter of law." *Beard v. Banks,* —— U.S. ——, 126 S.Ct. 2572, 2578, 165 L.Ed.2d 697 (2006) (citing Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If Kraft has done so, the Court must next determine whether Munn has, " 'by affidavits or as otherwise provided' in Rule 56 (*e.g.* through depositions, etc.) 'set forth specific facts showing that there is a genuine issue for trial.' " *Id.* (quoting Rule 56(e) (emphasis deleted)). If not, the Court must enter judgment in Kraft's favor. *See id.*

On a motion for summary judgment, the "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [his] favor." *Groh v. Ramirez,* 540 U.S. 551, 562, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) (alteration revised) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## II. BACKGROUND

The following facts are either undisputed or viewed in the light most favorable to Munn, the nonmoving party.

Munn began working for Kraft in its Oscar Mayer Foods Division in Davenport, Iowa, in 1987. There, he joined the United Food and Commercial Workers International Union, AFL–CIO, which represented certain employees at the Davenport facility.

Also in 1987, Iowa enacted a statute regulating drug testing of employees in the private sector. Iowa Code § 730.5 (hereinafter the Act) (added by Acts 1987 (72 G.A.) Ch. 208, § 1). The Act stated that an employer could require a specific employee to submit to a drug test if six conditions were all met; the first condition was that the employer must have probable cause to believe the employee's faculties were impaired on the job. § 730.5(3)(a)-(f) (1997).[2]

---

**2.** The Act stated as follows:

This section does not prohibit an employer from requiring a specific employee to submit to a drug test if all of the following conditions are met:

a. The employer has probable cause to believe that an employee's faculties are impaired on the job.

b. The employee is in a position where such impairment presents a danger to the safety of the employee, another employee, a member of the public, or the property of the employer, or when impairment due to the effects of a controlled substance is a violation of a known rule of the employer.

c. The test sample withdrawn from the employee is analyzed by a laboratory or testing facility that has been approved....

d. If a test is conducted and the results indicate that the employee is under the influence of alcohol or a controlled substance or indicate the presence of alcohol or a controlled substance, a second test using an alternative method of analysis shall be conducted....

e. An employee shall be accorded a reasonable opportunity to rebut or explain the results of a drug test.

f. The employer shall provide substance abuse evaluation, and treatment if recommended by the evaluation....

§ 730.5(3)(a)-(f) (1997).

Kraft and union representatives periodically renegotiated and amended the collective bargaining agreement (CBA) pertaining to Kraft employees in Davenport. Sometime prior to 2002, an amendment added a drug-testing policy, which was contained in Appendix G of the CBA. (Def.'s App. at 115.) The policy included probable cause in its description of when Kraft could ask an employee to submit to a drug test, stating:

A.... Where there is probable cause to believe an employee's faculties are impaired on the job, the Company will require employees to undergo testing to determine the presence of drugs under any of the following conditions occurring on Company premises:

1. An employee incurs an OSHA recordable injury of suspicious or unusual nature.

2. An employee causes injury to another.

3. An employee's actions result in equipment or property damage.

4. An employee's behavior gives indication of being "under the influence" or the behavior is unusual or suspicious in nature.

Def.'s App. at 115. The Human Resources Manager, or his or her designee, would review a "reasonable cause determination" prior to testing. *Id.* If an employee refused to submit to a drug test under any of the above conditions, he would be fired. *Id.*

The legislature amended the Act in 1998 and 1999 to change several provisions and add many others, expanding the subsections from 11 to 16. Among the changes, the amended Act modified the subsection describing the circumstances under which an employer could conduct drug or alcohol testing. One modification permitted employers to conduct "reasonable suspicion drug or alcohol testing," § 730.5(8)(c) (1999), defined as meaning the following:

drug or alcohol testing based upon evidence that an employee is using or has used alcohol or other drugs in violation of the employer's written policy drawn from specific objective and articulable facts and reasonable inferences drawn from those facts in light of experience. For purposes of this paragraph, facts and inferences may be based upon, but not limited to, any of the following:

. . . . .

(5) Evidence that an employee has caused an accident while at work which resulted in an injury to a person ... or resulted in damage to property, including to equipment, in an amount reasonably estimated at the time of the accident to exceed one thousand dollars.

*Id.* at (1)(h)(5). Under another change, an employer investigating a workplace accident could require an employee to take a drug test on the sole basis that the accident resulted in injury to a person, or property damage estimated to exceed $1,000, independent of any reasonable-suspicion determination. *See id.* at (8)(f).[3] In addition, the Act provided that if an employee refused to provide a testing sample, an employer could use that refusal as a

---

3. The amended Act stated in pertinent part as follows:

8. Drug or alcohol testing. Employers may conduct drug or alcohol testing as provided in this subsection:

. . . . .

f. Employers may conduct drug or alcohol testing in investigating accidents in the workplace in which the accident resulted in an injury to a person .... or resulted in damage to property, including to equipment, in an amount reasonably estimated at the time of the accident to exceed one thousand dollars.

§ 730.5(8)(f) (1999).

valid basis for discipline, including termination of employment, "pursuant to the requirements of the employer's written policy and requirements of this section." *Id.* at (10)(a). The Act as amended remained in effect during the period at issue here.

Kraft's assistant manager for human resources, Rodney Warhank, participated in negotiating the CBA in effect from 2002 until April 9, 2006. Warhank testified in his deposition that during negotiations, Kraft wanted to revise the drug-testing policy in Appendix G of the pre–2002 CBA, but the union would not agree. Consequently, Appendix G to the pre–2002 CBA was adopted unchanged as Appendix G in the CBA in effect from 2002 until April 9, 2006.

Kraft asserts the CBA provided, "that employee concerns or claims *may* be taken through the grievance process and are ultimately subject to binding arbitration." (Def.'s Statement Undisputed Mat. Facts at 4 (emphasis added).) The CBA's "Grievance Procedure" section stated that if union and company representatives could not agree on resolving a grievance, the grievance would be referred to arbitration. The section did not specifically mention grievances relating to termination of employment or the drug-testing policy. The CBA stated an arbitrator had no right to "modify, amend, or add to the terms of the [CBA]." (Def.'s App. at 86 (alteration added).)

Warhank testified in his deposition that for "quite some time" before June 2004, Kraft's policy regarding drug testing of employees following damage to company property was that, "if an individual is involved in an incident that results in the damage of company property estimated to be in excess of $1,000, they would be requested to undergo a drug sampling." (Warhank Dep. at 16.) The parties do not dispute that the CBA did not contain this policy in writing.

On October 28, 2003, Kraft issued, and on March 15, 2004, revised, a form entitled Employee Notification Form—Drug Collection & Screening. The form stated in part as follows:

> As authorized in Appendix G of the [CBA], the Company is requiring you to submit to a medically supervised drug test (urine drug collection and screen) for the following reason(s):
>
> A. Employee incurred an OSHA recordable injury of suspicious or unusual nature.
>
> B. Employee caused injury to another employee.
>
> C. Employee's actions resulted in equipment, property or product damage in an amount estimated to exceed $1000.
>
> D. Employee's behavior gives indication of being "under the influence" or the behavior is unusual or suspicious in nature.

Def.'s App. at 223 (alteration added). The form provided that if an employee refused Kraft's request under the form that he take a drug test, Kraft could fire him, as outlined in Appendix G. The form did not mention grievance or arbitration, or cite any CBA provisions dealing with grievance or arbitration. Kraft's policy was to give the form to an employee to sign before undergoing drug testing. The form was also available for employees at the Human Resources Department, but no evidence indicates that Kraft informed its employees—other than those workers Kraft asked to sign the form before undergoing a drug test—about the form and its availability at the department.

By June 2004, Munn had been working four to five years as a forklift driver in the receiving area of the company's ware-

house. He was certified to operate forklifts and other vehicles. He worked on the 4 a.m. to 2:30 p.m. shift.

The receiving area had a dock where semitrailer truck drivers delivered food. The drivers would back their vehicles up to one of nine overhead doors that opened into warehouse bays. A Kraft employee would operate an electric switch to open the motorized overhead door, which resembled a garage door. Then, a forklift driver would drive from the warehouse bay into the semitrailer to pick up a load of food. After backing the forklift out of the trailer into the bay, the driver deposited the food on a palette for weighing and inspection before delivery to another department. The forklift driver repeated the process until he finished unloading the semitrailer. An employee then closed the overhead door as soon as possible to keep the warehouse cool.

The doors were "quite old," and required repairs approximately once a week. (Munn Dep. at 67–78.) Two co-workers testified in depositions that before June 7, 2004, they had seen door No. 8 fall partway closed after being opened, and at least one of the employees had told a manager what she had seen.

On June 7, 2004, shortly after 6 a.m., Munn drove a forklift from the warehouse into a semitrailer to unload mechanically deboned chicken, which Munn described as the hardest product to unload. Munn stated that deboned chicken is shipped in 2,000–pound cardboard bins, has a consistency similar to gelatin, and shifts frequently, causing the bins to smash. When removing the deboned chicken, Munn had to quickly back the forklift out of the trailer and into the warehouse to prevent the load from falling back into the trailer. Testimony indicated the refrigerated trailers often had wet, slippery floors.

Backing his forklift out of the trailer on June 7, Munn saw that the overhead door behind him, door No. 8, had fallen partway down its track. Munn "slammed on the brakes," but the forklift slipped on the trailer's wet floor and hit the door's bottom panel. (Munn Dep. at 74.) The impact damaged door No. 8, and employees could no longer open and close it with the electric switch. Co-workers, including Sompasong Onelangsy, manually helped Munn raise the door so he could drive his forklift out of the trailer and into the warehouse, and they helped him close the door. Onelangsy, a meat inspector, then photographed the damaged door and e-mailed the pictures to Michael Kane, the distribution manager, and Richard Overmann, Munn's supervisor.

The parties dispute whether Overmann walked to the dock to see the damaged door, as he claims he did sometime between 6:30 and 7:30 a.m. Overmann estimated the damage to the door exceeded $1,000. Cheryl Davis, an employee who saw door No. 8 fall and Munn's forklift hit the door, testified that at some point she told Overmann what she had seen.

At 10:30 a.m., Overmann summoned Munn to his office and asked him how the accident happened. After Munn explained, Overmann said he had to take a drug test because of damage to the door. Munn responded he did not believe he should have to take a drug test, because the accident was not his fault, and he asked to talk to a safety representative or union steward.

Either Munn or Overmann first suggested that Munn speak with Scott Serrano, the department's union steward, about the matter. Overmann testified in his deposition that he wanted Munn to speak with Serrano, so that the union steward could explain to Munn that Kraft would fire him if he refused to take a drug test. While

Munn waited, Overmann spoke separately with Serrano and told him about the accident and Munn's refusal to take a drug test. Overmann asked Serrano to speak with Munn about the ramifications of such a refusal.

During his meeting with Serrano, Munn described the accident and said Overmann contended the accident was Munn's fault. Munn told Serrano the accident was not his fault, and he did not want to take a drug test. Munn denied taking any drugs, and he stated in his deposition that his main concern was that he did not want the company to "write me up for damages," and he did not want to "go through all of the red tape and paperwork and ... finger pointing and ... the safety meetings and ... how reckless ... when I kind of pride myself on what I do ..... [M]y record is clean ... and I didn't want any of that to happen." (Munn Dep. at 131–32 (alteration added).) Munn told Serrano he wanted to talk with Bob Waters, the chief steward, who worked in another building. According to Munn, Serrano said Munn would probably have to take a drug test, and if he left the plant to see Waters, Kraft would probably suspend him. Munn told the steward he thought Overmann was harassing him, and said, "I want to talk to somebody, get it straight.... I will do whatever they want after that." (Munn Dep. at 105.) Serrano stated, and Munn denied, that he told Munn that Kraft would fire him if he did not take the drug test.

After talking with Serrano, Munn returned to Overmann's office. Munn still would not agree to a drug test, and he said he wanted to talk to Waters. According to Munn, Overmann said he would have to suspend Munn. Overmann walked Munn to the facility's gate and took his employee badge, the usual procedure for a suspension.

Overmann stated in his deposition that he did not believe Munn was at fault in causing the accident. Overmann asked Munn to take a drug test because he believed the accident resulted in property damage exceeding $1,000. The parties agree that neither Overmann nor anyone gave Munn a copy of the Employee Notification Form or any writing stating the company could request an employee to take a drug test if the property damage at issue exceeded $1,000, even if the employee was not at fault, and that if the employee refused to take the test, Kraft could fire him.

Munn went to the union hall to see Waters, but he was out. Munn went home and called him. Munn told Waters that the accident was not his fault. When Waters said the company could fire him for refusing to take a drug test, Munn said he would return to work immediately to take a test. Waters said it was too late for that, because Munn had been gone from the plant for an hour.

Munn testified in his deposition that he wanted to file a grievance and talked with Waters about doing so, but Waters said Munn had violated the CBA and a grievance could not be filed. Waters testified that he did not file a grievance on Munn's behalf because the CBA's Appendix G stated that if an employee refused to take a drug test, the employee would be fired, and Munn refused his employer's request to take a drug test. Munn did not file a written grievance.

On June 9, 2004, Warhank sent Munn a letter notifying him of his discharge, effective June 7, "due to violation of Company Policy and Procedures." (Def.'s App. at 132.) Warhank testified that Munn was fired because he failed to comply with Kraft's drug-testing policy.

On June 15, Waters sent Warhank a letter requesting Munn's reinstatement. Warhank discussed the request with the Human Resources manager, Walter Schultz. Based on information from Overmann and Serrano about their talks with Munn, Warhank believed Munn had failed to "give any articulable reason whatever as to why he refused to take the drug test." (Warhank Dep. at 37.) Warhank concluded that Munn had no legitimate reason for refusing to take the drug test, because Warhank expected that if an employee had such a reason, "certainly he would bring it forward, especially when ... they understand that they are going to lose their job if they don't." *Id.* at 37–38. Specifically, Warhank noted that neither Munn nor anyone else ever questioned or complained that they did not believe that door No. 8's damage exceeded $1,000. On June 17, Warhank responded to Waters' letter and stated that Kraft had declined to reinstate Munn.

## III. DISCUSSION

Munn alleges Kraft failed to comply with the Act when it required him to take a drug test, and that this failure precludes Kraft's reliance on Munn's refusal to take the drug test as a basis for the decision to fire him. Kraft asserts three grounds for seeking summary judgment: Kraft did not violate the Act, because the company had statutory authority to request Munn to take a drug test and to fire him when he refused the request; Munn waived court action on his claim, because he did not file a grievance; and the Labor Management Relations Act preempts Munn's claim.

### A. Authorization to Request a Drug Test and to Discharge for Refusal

Kraft maintains it had authority to request Munn to take a drug test under the Act, which permits employers to conduct drug testing in the workplace when investigating an accident that resulted in property damage exceeding $1,000, and authority to rely on that refusal in deciding to fire him. *See* § 730.5(8)(f), (10)(a)(3) (2003). Accordingly, Kraft argues, it is immune from suit under § 730.5(11)(a), which states that a cause of action based on an employee's or prospective employee's refusal to submit to a drug or alcohol test, "shall not arise against an employer who has established a policy and initiated a testing program in accordance with the testing and policy safeguards provided for" in the Act. (*See* Def.'s Mem. Law Supp. Mot. Summ. J. at 10.)

Under the Act, an employer "may test employees and prospective employees for the presence of drugs or alcohol as a condition of continued employment or hiring." § 730.5(4). If an employee refuses to provide a testing sample, the employer may use that test refusal as a valid basis for disciplinary action, including discharge, "pursuant to the requirements of the employer's written policy and the requirements of this section." § 730.5(10)(a).

The Act's "manifest purpose" is to "regulate drug testing initiated by employers for the purpose of influencing employment decisions." *See Harrison v. Employment Appeal Board,* 659 N.W.2d 581, 588 (Iowa 2003). An employee may file a civil action against an employer for violating the Act, and may seek remedies including reinstatement, with or without back pay, and other appropriate relief, including costs and attorney fees. § 730.5(15)(a). When an employee alleges his employer required or requested a drug test in violation of the Act, "the employer has the burden of proving" it met the Act's requirements. § 730.5(15)(b).

One such requirement is that an employer must carry out its drug testing within the terms of a written policy that has both,

"*been provided to* every employee subject to testing," and "*is available for review* by employees and prospective employees." § 730.5(9)(a)(1) (emphasis added). The written policy must include information about actions the employer will take based on a positive drug test result or a refusal to be tested. § 730.5(k)(8), (9).

Munn claims Kraft failed to comply with the Act's requirement that an employer carry out its drug testing within the terms of a written policy that the employer both provided to every employee subject to testing, and made available for review by employees and prospective employees. *See* § 730.5(9)(a)(1) (2003). Essentially, Munn alleges Kraft failed to provide him with the company's complete written policy, particularly the provision in the Employee Notification Form that stated Kraft could require an employee to submit to a drug test when the employee's actions, irrespective of his fault, resulted in property damage estimated to exceed $1,000, and that Kraft could fire the employee based on his refusal to take the drug test. Munn contends that Kraft never gave him a copy of the Employee Notification Form. Although Munn does not dispute the form was available for review in the Human Resources Department, he states that employees would have to be aware of and request the form in order to see it. No evidence indicates Munn was aware of the form or its availability in the Human Resources Department.

Kraft argues it complied with the Act's requirement to provide employees its drug-testing policy in writing, in that the $1,000 minimum damage requirement was contained in the Employee Notification Form, the form was available to all employees through the Human Resources Department, and Kraft's practice was to obtain the employee's signature on the form prior to a drug test. (*See* Def.'s Reply Supp. Mot. Summ. J. at 3.) Kraft asserts Munn did not receive the form on June 7, 2004, because he left work after Overmann asked him to take the test.

The Iowa Supreme Court has not yet decided whether strict compliance with the Act is required, or whether substantial compliance is sufficient. *See Harrison,* 659 N.W.2d at 586. If the Court determines that a genuine issue of material fact exists concerning whether Kraft even substantially complied with § 730.5(9)'s provisions, it need not resolve this issue. *See id.*

Substantial compliance is "compliance with respect to those requirements that are necessary 'to assure the reasonable objectives' of the statute are met." *Id.* (citing *Superior/Ideal, Inc. v. Bd. of Review,* 419 N.W.2d 405, 407 (Iowa 1988)). The Court therefore starts its analysis by identifying the purpose served by the provisions contained in § 730.5(9)(a)(1) requiring publication of the written policy. *See id.* (identifying the purpose served by the notice provisions in subsection (7) of the Act as the starting point for the court's analysis of whether employer substantially complied with provisions' notice requirements).

Review of the written policy and other testing requirements imposed in subsection (9) indicates that the legislature sought to ensure that employers would set uniform standards for discipline and rehabilitation and would provide notice to all employees ·of necessary information regarding their employer's drug-testing policy. *See* § 730.5(9)(a)(1) (employer shall provide copy of the written policy to parents of minor employees); § 730.5(9)(a)(2) (using certified mail, employers shall provide parents of minor employees with notice required by subsection (7) regarding testing procedures); § 730.5(9)(b) (employer's written policy shall provide uni-

form requirements for disciplinary or rehabilitative actions against an employee, and shall also provide that employers may not take adverse employment action against an employee who is complying with rehabilitation requirements and successfully completes rehabilitation); § 730.5(9)(c) (employers shall establish an awareness program to inform employees of dangers of drug and alcohol use in the workplace); § 730.5(9)(c)(1) (if an employer has an employee assistance program, the employer must inform the employee of the program's benefits and services, post notice of the program in conspicuous places, and provide employees with notice of the policies and procedures regarding access to and use of the program); § 730.5(9)(c)(2) (if an employer does not have an employee assistance program, the employer must maintain—and inform employees about the existence of—a resource file of certified alcohol and drug abuse programs and other entities available to help employees with personal or behavioral problems); § 730.5(9)(e) (the employer shall establish in its written policy a standard for alcohol concentration in testing); § 730.5(9)(g) (the written policy shall provide information regarding apportionment between the employee and the employer of the costs of rehabilitation).

In subsection (9), the legislature apparently intended to benefit and protect employees by requiring their employer to give them written notice of necessary information regarding the employer's drug-testing policy, including uniform standards for discipline and rehabilitation. The Court must determine if a genuine issue of material fact exists regarding whether Kraft's actions in providing its written policy to Munn accomplished the legislature's intention to protect the employee from adverse employment action based on lack of knowledge of the employer's disciplinary

standards and other drug-testing policies. *See Harrison,* 659 N.W.2d at 587.

The Court will consider how § 730.5(9)(a)(1) protects the employee by requiring that employers must carry out drug or alcohol testing within the terms of a written policy that has been provided to every employee subject to testing, and is available for employees to review. *See Harrison,* 659 N.W.2d at 587. Because a written document conveys a message that the document's contents are important, an employee receiving such a document, "would be more likely to consider his decision with respect to [refusing a drug] test to be an important one," and, "would more deliberately reflect on his options and the ramifications of his decision." *Id.* (alteration added). The requirement that the employee be informed of the employer's basis for requiring a drug test, and of the requirements for what disciplinary actions the employer shall take against the employee if he refuses to provide a testing sample, insures the employee's decision will be a well-informed one and be based on all relevant considerations. *See id.* The requirement that an employer provide written notice of uniform requirements for disciplinary actions when an employee refuses to submit to a drug test insures that an employee will be treated fairly and not unreasonably led to refuse a drug test. *Cf. id.*

In determining whether a factual dispute exists concerning the effectiveness of the notice given by Kraft, and therefore the adequacy of the company's compliance with the Act's requirements, the Court views Kraft's publication of its policy from the perspective of Munn, who was engaged in the process of deciding whether he should comply with his employer's request to take a drug test. *Cf. Arlington Central Sch. Dist. Bd. of Educ. v. Murphy,* —— U.S. ——, 126 S.Ct. 2455, 2459, 165

L.Ed.2d 526 (2006) (stating that in analyzing whether federal statute furnished clear notice to state officials regarding the liability at issue, a court must view the statute from the perspective of a state official who is engaged in the process of deciding whether the state should accept federal funds pursuant to the statute and the obligations attached to those funds).

Munn has raised an inference that Kraft gave him no written notice that under the company's policy, Kraft could require him to take a drug test on the sole basis that, through no fault of his own, he was involved in an accident that caused property damage estimated over $1,000. No evidence indicates Munn knew the Employee Notification Form was available to him in the Human Resources Department or elsewhere. Munn believed Overmann asked him to take a drug test because he thought Munn was at fault in damaging the overhead door. Overmann did not inform Munn otherwise. Kraft argues that Munn did not receive a copy of the Employee Notification Form, because he left work after refusing to take a drug test. But Overmann talked with Munn twice before he left, walked him out, and never tried to give Munn the form.

According to Munn, before he left work, no one told him he could be fired for refusing to take a drug test under the circumstances. Munn has raised a reasonable inference that if he had known his employer could require him to take a drug test without any reason to believe he was at fault for the accident—based solely on the estimated amount of damage—and that his employer could fire him if he refused to take the test on that basis, Munn would have more deliberately reflected on his options and on his decision's ramifications. He provided evidence indicating that had he known he could be fired under the circumstances, he would have agreed to take the test.

■ Munn's refusal to take a drug test was ill-informed and not based on all relevant considerations. His decision was certainly not a knowledgeable one, "given the fact that he had incomplete and inaccurate information upon which to base his decision." *Harrison*, 659 N.W.2d at 588. Viewing the facts and reasonable inferences in the light most favorable to Munn, the Court finds he has generated genuine issues of material fact concerning whether Kraft provided him the Act's statutory protections, and accordingly whether Kraft substantially complied with the Act. Specifically, Munn has raised an inference that in discharging him, Kraft invoked its drug-testing policy without complying with the Act's requirement that the company give Munn its full written policy, including the provision Kraft invoked to request Munn to take a drug test.

The Court therefore cannot grant summary judgment to Kraft on the basis that no genuine issue of material fact is in dispute, and as a matter of law the company's compliance with the Act's requirements was sufficient to permit Kraft to require Munn to take a drug test on the basis the property damage exceeded $1,000, and to rely on Munn's refusal to take the test as a reason to fire him. *See id.* (stating it would be contrary to the spirit of Iowa's drug-testing law if the court were to allow employers to ignore the protections afforded by the Act, but gain the advantage of using a drug test that did not comport with the law); *cf. Tow v. Truck Country of Iowa*, 695 N.W.2d 36, 39 (Iowa 2005) (affirming lower court's finding that employer's invocation of its drug-testing policy in the consideration of plaintiff's employment, without complying with the statutory requirement

that the employer pay "all actual costs" for drug testing, violated the Act).

### B. Failure to File a Grievance

As its next asserted basis for summary judgment, Kraft argues that Munn waived his right to pursue in court his claim under the Act, because although he "contractually agreed to resolve employment-related claims through the grievance and arbitration procedure set forth in the CBA," he did not file a grievance to resolve his claim. (Def.'s Mem. Law Supp. Mot. Summ. J. at 10.) Munn denies he has waived his right to pursue his claim in court, pointing out that his cause of action asserts a claim for violation of his rights under the Act and does not implicate the CBA.

■ Contractual remedies provided under a collective bargaining agreement are generally exclusive. *Cross v. United Auto Workers, Local 1762*, 450 F.3d 844, 846 (8th Cir.2006); *see Coca–Cola Bottling Co. of St. Louis v. Teamsters Local Union No. 688*, 959 F.2d 1438, (8th Cir.1992) ("[w]here parties have a bargained-for agreement to resolve disputes via arbitration, courts ordinarily must defer to the resolution reached by the ... arbitrator"); *cf. Turner v. Holbrook*, 278 F.3d 754, 757 (8th Cir.2002) (noting that when a CBA provides a mail carrier rights and access under a grievance system, the carrier is precluded from seeking relief outside that system). Where, however, another agreement supersedes the CBA, the other agreement controls resolution of an employment dispute. *Cf. Coca–Cola Bottling*, 959 F.2d at 1440–41 (holding last-chance agreement superseded the CBA; affirming grant of summary judgment to employer and vacating arbitrator's award to employee). The Court must decide if Kraft is correct that as a matter of law the CBA and its grievance and arbitration procedure controlled the dispute at issue.

■ No evidence indicates the parties intended for the CBA's grievance and arbitration procedures to apply to employment provisions appearing solely in the Employee Notification Form, and not in the CBA. The CBA's Appendix G stated that Kraft intended to comply with Iowa law requiring probable cause for drug testing, "until such law is modified, at which time the Company may modify the program to comply with any new law." (Def.'s App. at 168.) As discussed above, however, a genuine issue of material fact exists concerning whether the changes reflected in Kraft's drug-testing policy, as contained in the company's Employee Notification Form, were in keeping with Iowa law, because notice to employees was lacking.

Renegotiating the CBA applicable during the period at issue, the union declined to agree to Kraft's proposed changes to the bargained-for policy in Appendix G. No evidence indicates the nature of Kraft's proposed changes. No evidence shows that Kraft and the union negotiated the Employee Notification Form, and the form makes no provision for grievance and arbitration.

The $1,000–damage ground Overmann relied on in requiring Munn to take a drug test was not among the grounds authorized in the CBA. If Munn's claim had been submitted through the CBA's grievance and arbitration process, an arbitrator would not have known from reading the CBA that Kraft had changed its drug-testing policy to allow the employer to request an employee to take a drug test when the property damage exceeded $1,000, and if the employee refused the request, to allow Kraft to fire him based on his refusal. The arbitrator also would have had no right to alter the CBA's drug-testing policy to require Kraft to provide employees with a written copy of its policy change. (*See* Def.'s App. at 86 (CBA's

grievance procedure stated that, "The arbitrator shall have no right to modify, amend, or add to the terms of the Agreement")).

In support of its argument, Kraft first cites *Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) ("[A]ny doubts concerning the scope of issues should be resolved in favor of arbitration") (alteration added). *Moses*, however, unlike this case, concerned the way the law treats silence or ambiguity about the question of "whether a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement," when the parties have a contract that provides for arbitration of some issues. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944–45, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (emphasis deleted). In this case, the undisputed facts do not show as a matter of law that the parties agreed through the CBA to arbitrate the Act's provisions, including the Act's requirement that an employer conduct its drug testing pursuant to a written policy that has been provided to employees. For the same reason, the Court concludes the other case Kraft cites, *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 123, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) ("[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial forum"), is inapposite. Based on the summary judgment record, the Court holds that Kraft has not established as a matter of law that the CBA and its grievance and arbitration

procedure controlled the dispute at issue. Accordingly, Kraft is not entitled to judgment as a matter law on the ground that Munn did not present his claim through the CBA's grievance and arbitration process.

## C. Preemption

Finally, Kraft maintains that even if Munn did not contractually agree to submit his claim through the CBA's grievance and arbitration process, his claim is preempted by § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, because the Court cannot, without interpreting the CBA, address the substance of Munn's claim that Kraft violated § 730.5.[4] Munn disagrees that the Court must interpret the CBA to address the substance of his claim.

 Section 301 provides for federal jurisdiction over "suits for violation of contracts between an employer and a labor organization," to fashion federal common law for resolving labor disputes in a uniform manner nationally. 29 U.S.C. § 185; *Trustees of The Twin City Bricklayers Fringe Benefit Funds v. Superior Waterproofing, Inc.*, 450 F.3d 324, 330 (8th Cir. 2006) (citing *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985)). Preemption under § 301 applies to any state law claim founded on rights created by a CBA, and to any claim whose resolution is substantially dependent upon or inextricably intertwined with the interpretation of a CBA's terms. *Id.* "An otherwise independent claim will not be preempted if the CBA need only be consulted during its adjudication." *Id.*

---

**4.** Kraft thus asserts preemption as a defense—contending Munn's claim cannot be litigated in this action—as distinct from the jurisdictional doctrine of complete preemption used to remove state claims to federal court. *Trustees of The Twin City Bricklayers*

*Fringe Benefit Funds v. Superior Waterproofing, Inc.*, 450 F.3d 324, 329 n. 3 (8th Cir. 2006) (citing *Caterpillar v. Williams*, 482 U.S. 386, 392–93, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987)).

(citing *Livadas v. Bradshaw*, 512 U.S. 107, 124–25, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994)).

■ To determine whether it must interpret the CBA to resolve Munn's state law claim, the Court starts by examining Munn's claim. *See id.* at 331. Munn alleges Kraft violated his rights under the Act by requesting him to take a drug test based on a ground stated in the Employee Notification Form, which was not provided to him, and by firing him for his refusal to undergo the requested test. Munn's claim does not require the court to resolve a conflict between provisions in the CBA and the Act, or to otherwise interpret the CBA. Adjudication of the claim requires analysis of the Act's requirements and the sufficiency of Kraft's compliance with those requirements in relation to the company's actions against Munn under the Employee Notification Form. Concerning the CBA, Munn's claim requires only consulting or referring to the agreement. *See Livadas*, 512 U.S. at 124–25, 114 S.Ct. 2068 (holding § 301 preemption did not apply because a wage provision in the CBA only had to be reference to compute the proper damages).

Kraft has not established that Munn's state law claim is founded on rights created by the CBA, or that his claim's resolution is substantially dependent upon or inextricably intertwined with interpretation of the CBA's terms. Kraft therefore is not entitled to summary judgment on the basis of § 301 preemption.

## IV. CONCLUSION

Viewing the facts and inferences in the light most favorable to Plaintiff, the Court **denies** Defendant's Motion for Summary Judgment (Clerk's No. 36) for the following reasons.

Genuine issues of material fact remain in dispute regarding whether Defendant's compliance with the Act's requirements was sufficient to permit the company to require Munn to take a drug test because the property damage at issue was estimated to exceed $1,000 and to rely on his refusal to take the drug test as a basis to fire him.

The Court holds Defendant has not established it is entitled to judgment as a matter law on the basis that Plaintiff waived his right to bring his claim in court, in that he did not present his claim through the CBA's grievance and arbitration process.

Finally, Defendant has not shown the preemption defense available under the Labor Management Relations Act's § 301 applies, because Defendant has not established that Munn's state law claim is founded on rights created by the CBA, or that the claim's resolution is substantially dependent upon or inextricably intertwined with interpretation of the CBA's terms.

This case remains set for Final Pretrial Conference on September 5, 2006, at 9:30 a.m., by telephone conference call placed by Plaintiff's counsel, and for jury trial beginning on September 18, 2006. The parties shall comply with the requirements for Final Pretrial Conference as previously set forth in the Proposed Order for Final Pretrial Conferences. The parties are reminded that they may contact the Hon. Ross A. Walters, telephone 515–284–6217, to discuss scheduling a settlement conference.

IT IS SO ORDERED.